WILLIAMS, Circuit Judge.
Tamara Phillips contends that police officers used excessive force in arresting her when they shot her four times in the leg with an SL6 baton launcher after she disregarded their orders to come out of her car. Phillips’s case was tried to a jury, which returned a verdict in the officers’ favor. Phillips appeals, contending that *517 the district court erroneously denied her post-verdict motion for judgment as a matter of law. Because we find that the officers used excessive force and are not entitled to qualified immunity, we reverse.
I. BACKGROUND
The facts in this case are largely undisputed. Around 7:00 p.m. on November 11, 2005, Lieutenant Russell Jack and Officer James Hoffman from the Waukesha Police Department received a dispatch reporting a possibly intoxicated driver. The original caller described a black car that was “all over the road.” After running the car’s plates, police dispatch initially informed officers that the plates “hit” to a black Nissan Maxima that had been reported stolen.
Shortly afterward, a responding officer, Brandon Pierce, pulled up the stolen vehicle record from his squad car and called in to note that the “hit” was to a car with the same license plate number but a different color, make, and model — a silver Honda Civic. The police dispatcher noted the discrepancy, stating that the original caller had specified that the drunk driver was in a black Nissan Maxima. Lieutenant Jack asked the dispatcher to contact the original caller to verify the car’s color and make. Though the caller could not be reached, the dispatcher checked the vehicle record again and alerted officers that, “the listed owner on the Nissan Maxima is the complainant for the vehicle theft on the Honda Civic, silver in color with that plate assigned. So I am unsure why that plate is reassigned to the Nissan Maxima.” Both cars were registered to the same person: Tamara Phillips. Officer Hoffman later testified that there was confusion surrounding the car, the license plates it bore, and the fact that the plates “hit” to a different vehicle.[1]
Within several minutes of receiving the dispatch, the officers located the black Nissan Maxima, with its door ajar, on a sidewalk near an apartment complex. The driver had backed the car into a hedgerow. Behind the hedgerow, there was an electrical box and a five-foot drop-off into a neighboring parking lot. It is unclear whether the car was still running, but the officers testified that they believed it was because its lights were on.
Officer Hoffman stated that the incident was treated as a “high-risk traffic stop” because the car was believed to be stolen, had stopped in a residential area, and was pointed toward the street in the direction of the officers. During a high-risk traffic stop, instead of walking up to a car and exposing themselves to potential danger, the officers will order the driver to shut off the car, put the keys outside, step out, and walk to a safe location where the person can be placed in custody.
With the help of several other officers who had since arrived at the scene, seven squad cars were strategically placed around the Nissan Maxima. Once the squad cars were in place, Lieutenant Jack radioed the dispatch and said, “We have the person secured here, not in handcuffs, but stabilized in the car.” Officer Hoffman pointed his squad car’s headlights and spotlight toward the vehicle to illuminate its interior. He saw one person inside — a female driver who, at least initially, was moving about inside the car.
The officers, who were equipped with body shields for protection, identified *518 themselves as police and loudly commanded the driver to show her hands and get out of the car. The driver did not comply, but instead reached for a compartment in the vehicle and lit a cigarette. At one point, the driver put both of her feet out of the driver-side window onto the door, resting them near the side-view mirror, while she leaned back toward the center console. She also picked up a water bottle and set it on the ground beside the car.
The officers estimated that they gave orders to the driver continuously for ten minutes before deciding to use their SL6. The SL6 Baton Launcher is a shoulder-fired, semi-automatic firearm that fires polyurethane bullets with a force equivalent to a .44 magnum pistol. Its use has been deemed “less lethal” by the Waukesha Police Department’s use of force policy, and is considered tantamount to using a bean-bag shotgun or a hand baton. The “target area” for an SL6 is below a person’s belly button, excluding the groin. The officers testified that the SL6 is designed to be used against persons exhibiting resistive, assaultive, or other dangerous behavior.
Officer Hoffman was 40 to 50 feet away from Phillips’s car when he fired a warning shot, which hit the vehicle with a loud bang and left a baseball-sized dent on the driver-side door. The officers then waited five minutes while they issued commands ordering the driver to get out of the car. At this point, the driver was lying on the front seat toward the center console with her bare legs outside the front driver-side door of the car and her feet on the ground.
When the driver did not comply, the officers aimed at her leg and fired. A few seconds later, the driver yelled out in pain and reached down to her legs, but she did not pull them back into the car or otherwise attempt to protect herself. Another fifteen seconds passed and the officers fired again. The driver did not move. The officers waited another three seconds and shot again. The driver again did not move. After another three seconds, the officers fired again, hitting her a fourth time. This time, the driver complied by “slumping” out of the car and kneeling on the ground. Lieutenant Jack then ordered the driver to stand back up and walk backwards toward him or she would be shot again. The driver did as she was told and the officers arrested her.
Plaintiff-Appellant Tamara Phillips, who turned out to be the very drunk driver— yet lawful owner of the car, sustained two injuries on the inside of her lower right leg in the ankle area and two other injuries to her upper left leg. The most serious injury was to her right ankle, where one of the bullets left a six-inch wound requiring thirty stitches because the flesh was torn from the bone. Phillips, who works as a personal trainer, was unable to walk for a week, and walked with a cane for approximately three weeks.
On September 5, 2006, Phillips sued, claiming that the officers had used excessive force in arresting her. The case was tried twice. The first trial ended in a deadlocked jury and the court declared a mistrial. The second trial resulted in a verdict for the officers. After the verdict, Phillips moved for judgment as a matter of law, or, in the alternative, for a new trial. The court denied the motion. This appeal followed.[2]
*519 II. ANALYSIS
We review a district court’s denial of a motion for judgment as a matter of law de novo, asking whether the evidence presented, combined with all reasonable inferences permissibly drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict. Artis v. Hitachi Zosen Clearing, Inc., 967 F.2d 1132, 1139 (7th Cir.1992). For Phillips to be entitled to judgment as a matter of law, the officers must have used excessive force in arresting Phillips in violation of her Fourth Amendment right to be free from unreasonable searches and seizures. See McAllister v. Price, 615 F.3d 877, 884 (7th Cir.2010). Furthermore, for Phillips to prevail, the officers must not be entitled to qualified immunity for their conduct.[3] See Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).
A. Constitutional Violation
The nature and extent of force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest, including “the seventy of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). “Determining whether the force used to effect a particular seizure is ‘reasonable’ under the Fourth Amendment requires a careful balancing of ‘the nature and quality of the intrusion on the individual’s Fourth Amendment interests’ against the countervailing governmental interests at stake.” Id. (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). An officer’s use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest. Gonzalez v. City of Elgin, 578 F.3d 526, 539 (7th Cir.2009). We must also bear in mind when considering the totality of the circumstances that “police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolv *520 ing — about the amount of force that is necessary in a particular situation.” Graham, 490 U.S. at 397, 109 S.Ct. 1865. This constitutional inquiry is objective and does not take into account the motives or intent of the individual officers. Id.
Objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide. Bell v. Irwin, 321 F.3d 637, 640 (7th Cir.2003). We defer to a jury’s determination of what occurred during an arrest or whose testimony is credible. But a constitutional tort is not “an analog of civil negligence.” Id. In a traditional negligence case, we permit the jury to determine whether conduct was reasonable under the circumstances. In an excessive force case, while we accept the factual inferences made by the jury, we must independently review the jury’s interpretation of what is reasonable under the Fourth Amendment. Id.-, cf. Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (“A policy of sweeping deference [by appellate courts to factfinders’ determinations of probable cause] would permit ... the Fourth Amendment’s incidence to turn on whether different [factfinders] draw general conclusions that the facts are sufficient or insufficient to constitute probable cause. Such varied results would be inconsistent with the idea of a unitary system of law.” (internal quotation marks, alterations, and citation omitted)).
Independent review is particularly warranted when, as here, the material facts of the case are essentially uncontroverted. Although she testified at trial, Phillips was unable to offer a description of the arrest because she had very little memory of the incident and could only “recall bits and pieces.” The officers’ account was the only complete version provided to the jury and it did not conflict with Phillips’s testimony. Any ambiguities in the record we construe in the defendants’ favor.[4] This leaves us to consider the core constitutional question: whether use of multiple shots from an SL6 weapon to secure a non-resisting, intoxicated arrestee amounted to excessive force under these circumstances.
Phillips contends that the Graham factors weigh in her favor because she posed no immediate threat to anyone during the arrest, offered no resistance, and made no attempt to flee. The defendants argue *521 that their use of the SL6 was justified because Phillips was drunk, may have been driving a stolen car, and presented a potential threat to the officers and the community.
1. Amount of Force Employed by the SL6 Weapon
To determine whether a constitutional violation has occurred, we first evaluate the level of force used to arrest Phillips. The record establishes that the force exerted by an SL6 bullet is roughly comparable to a projectile from a bean-bag shotgun. Other courts of appeals have observed that baton launchers and similar “impact weapons” employ a substantially greater degree of force than other weapons categorized as “less lethal,” such as pepper spray, tasers, or pain compliance techniques. In Deorle v. Rutherford, the Ninth Circuit considered a bean-bag shotgun projectile as “something akin to a rubber bullet.” 272 F.3d 1272, 1280 (9th Cir.2001). Deorle concluded that “the cloth-cased shot constitutes force which has the capability of causing serious injury, and in some instances does so.” An officer provided expert testimony that a “Use of Force Continuum ... would list an impact weapon high on the schedule of force” and that “[i]t would be unreasonable for an officer to use an impact weapon on an unarmed person.” Id. at 1280 & n. 17 “Such force is much greater than that applied through the use of pepper spray ... or a painful compliance hold.... ” Id. at 1279-80 (citations omitted); see also Thompson v. City of Chicago, 472 F.3d 444, 451 & nn. 18-19 (7th Cir.2006) (officer testimony regarding Chicago Police Department policies limiting use of “impact weapons” to “high-level, high-risk assailants” and describing such weapons as “unwarranted against a suspect resisting arrest” by punching and struggling); Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir.2005) (observing that the SL6 weapon “is classified as a ‘less lethal’ munition, [but that local] police regulations recognize that it can be used as a deadly weapon.”).
In Bell, the district court treated beanbag rounds used by officers “as a species of deadly force.” 321 F.3d at 639. But we found the record insufficient to determine whether such rounds should be considered deadly as a matter of law; we concluded only that they were “less lethal than bullets or buckshot.” Id.; see also Omdahl v. Lindholm, 170 F.3d 730, 733 (7th Cir.1999) (declining to resolve parties’ dispute over “whether the use of bean bag projectiles constituted deadly force or merely a higher level of force along a ladder of escalating force.”)
“For a particular application of force to be classified as ‘deadly,’ it must at least carry with it a substantial risk of causing death or serious bodily harm.” Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 593 (7th Cir.1997) (emphasis added) (internal quotations marks and citations omitted). Direct analogy to the above cases cannot be dispositive because impact weapon technology varies from case to case, as do the manner and circumstances when officers deployed impact rounds. Nevertheless, multiple SL6 shots fired with force equivalent to a .44 magnum pistol at the same part of an arrestee’s body clearly have the potential to cause serious injury, even when aimed at the lower body. Indeed, this is what happened to Phillips when the SL6 rounds tore flesh from her ankle, requiring a lengthy, painful recovery. As in Bell, this record does not permit us to determine whether multiple SL6 rounds aimed at the lower body carry a substantial risk of serious bodily harm per se. But we conclude from the case law and from the extent of *522 Phillips’s injuries that the force used during her arrest was at least on the high-end of the spectrum of less-lethal force. In other words, when balancing the “nature and quality of the intrusion” against the “governmental interest at stake,” we conclude that the intrusion upon Phillips’s Fourth Amendment rights was significant.[5] Such force, whether or not it inherently carries a substantial risk of serious bodily harm, “is not to be deployed lightly.” Deorle, 272 F.3d at 1272, 1279.
In Smith v. Ball State University Board of Trustees, we considered an excessive force claim brought by a plaintiff who drove onto a sidewalk and nearly hit several pedestrians while suffering from diabetic shock. 295 F.3d 763 (7th Cir.2002). After the driver failed to respond when police arrived at the scene, the officers pulled him from the car. Id. at 766. We found that officers reasonably believed the driver to be drunk and “were justified in using force to remove him, particularly given the potential threat to public safety of an intoxicated driver in command of a running vehicle.” Id. at 770. Although he “was not actively resisting” during the arrest, we held that “a reasonable officer who happened on the scene could reasonably misconstrue [the driver’s] unresponsiveness as resistance requiring the minimal use of force.'” Id. at 771 (emphasis added); see also McAllister, 615 F.3d at 883 (finding material issue of fact over constitutionality of force used on semiconscious arrestee). The SL6 shots used on Phillips plainly exceeded the “minimal” force permitted for the suspected drunk driver in Smith.
2. Whether Officers Reasonably Believed Phillips’s Car Was Stolen
Smith differs from this case in that the officers who arrested Phillips testified that they believed she was driving a stolen car. There was plainly some confusion about the status of the vehicle on the night of the arrest. But the officers contend on appeal that they never received any information contradicting the initial report that Phillips’s black Nissan was stolen. This is incorrect. Officer Pierce checked the stolen vehicle record and alerted his colleagues that a silver Honda Civic had been reported stolen instead of the Nissan.[6] Before officers found Phillips, the dispatcher confirmed the initial mistake and attempted to clarify the confusion: “[T]he listed owner on the Nissan Maxima is the complainant for the vehicle theft on the Honda Civic, silver in color with that plate assigned. So I am unsure why that plate is reassigned to the Nissan Maxima.” In other words, the officers were advised that the license plate number was associated with two cars: a silver Honda Civic that had been reported stolen and a black Nissan Maxima with no report of being stolen but with plates “reassigned” from the Honda. The defendants admitted at trial that, before they located Phillips, the dispatcher had clarified that “the Honda Civic *523 was the original stolen vehicle” and that there was no “information ... that the black Nissan Maxima was stolen.”
We do not doubt or reconsider the officers’ testimony that they continued to believe they were dealing with a stolen car. But the question remains whether it was objectively reasonable for them to proceed on this assumption in the face of the contradictory information they received. At trial, Lieutenant Jack testified that the police continued to treat Phillips’s black Nissan as stolen because the Department of Transportation had a general policy prohibiting reassignment of plates from stolen cars to other vehicles. He also testified that the discrepancy in the car’s reported color did not concern him because owners often repaint their cars without updating vehicle records with the Department of Transportation. This may be true but it misses the essential point: On the night of the arrest, the officers never encountered the Honda Civic confirmed as the stolen vehicle. Though a car owner might repaint a vehicle without updating public records, this would not change the car’s make and model. And even if the Department of Transportation would not typically reassign stolen license plate numbers to another car, this does not alter the fact that officers were advised a Honda had originally been stolen rather than the Nissan with the reported drunk driver. No department policy could transform a Honda Civic into a Nissan Maxima. To continue believing Phillips was driving the car originally reported stolen, officers had to disregard the caller’s description of a different vehicle, as well as their own direct observation of the Nissan Maxima during the 15-minute standoff with the drunken Phillips.[7]
The conflicting information officers received could cause legitimate confusion, but at a certain point continuing confusion becomes objectively unreasonable. After the officers made the initial determination that they were dealing with a car theft, they appear to have had difficulty acknowledging subsequent information challenging their assumption. This is not because the officers were unaware of the discrepancy. The transcript shows Lieutenant Jack engaged in communications over the dispatch, with some transmissions directed to his personal call number. Lieutenant Jack considered contacting the original caller again to check whether he may have misidentified the car as a black Nissan Maxima. “It is not objectively reasonable to ignore specific facts as they develop (which contradict the need for this amount of force), in favor of prior general information about a suspect.” Cavanaugh v. Woods Cross City, 625 F.3d 661, 666 (10th Cir.2010); cf. Fisher v. Harden, 398 F.3d 837, 843 (6th Cir.2005) (finding it unreasonable for officer to rely on reported information to determine whether probable cause exists when direct observation or other information undermines the earlier report).
We take care to judge the situation “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. We respect that the defendants’ central priority on the *524 night of the arrest was apprehending the reported drunk driver and we sometimes defer to officers’ reasonable misunderstanding of a particular scenario. In spite of the contrary information the officers received, it could be considered reasonable to take additional precautions given the unusual circumstances surrounding the car’s license plates. That is, the jury could have concluded that it was initially reasonable to approach Phillips’s vehicle using the procedures associated with high-risk stops and to command Phillips to exit her car.
Nevertheless, at the time of the arrest, there was clearly sufficient information to call into question whether Phillips’s car was stolen. No “magical on/off switch” controls the level of force permitted to effectuate an arrest. Scott v. Harris, 550 U.S. 372, 382, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Cyrus, 624 F.3d at 863. The original police dispatch reporting a stolen black Nissan Maxima did not entitle officers to proceed on an unshakable assumption that they were pursuing a car thief. They could not simply ignore subsequent information that a different car had been stolen when they considered the appropriate amount of force to use. Cavanaugh, 625 F.3d at 666. Even if some understandable confusion and caution remained, we conclude that a reasonable officer would have been alert to the potential need to mitigate force in arresting the driver.[8] The officers’ certainty that they were dealing with a car theft was objectively unreasonable in light of the contrary information they received.
3. Whether Officers Used Excessive Force in Shooting Phillips Four Times with the SL6 Weapon
Even if the officers acted reasonably in treating the arrest as a high-risk stop because of uncertainty surrounding the license plates, the force they used to apprehend Phillips exceeded the level that was reasonable under the circumstances. At trial, the officers stated repeatedly that they believed Phillips was drunk. Officer Hoffman testified that he initially suspected Phillips was passing in and out of consciousness, though he later dismissed this idea after seeing her move intermittently within the car. Regardless of whether they believed Phillips was conscious throughout the entire incident, the officers knew they were dealing with an arrestee of diminished capacity.
It is also clear that Phillips was never “actively resisting arrest,” a touchstone of the Graham analysis. 490 U.S. at 396, 109 S.Ct. 1865. Phillips never exhibited any sort of aggressive behavior toward the officers before or after they located her car, nor did she make any attempt to escape.[9] The officers argue that Phillips demonstrated continuous “defiance” by failing to follow their commands to exit the vehicle. This characterization strains credulity given the circumstances. But viewing the evidence in the light most favorable to the *525 defendants, we presume that the officers reasonably believed that Phillips heard their orders and chose not to obey. Even so, leaving oneself exposed to repeated police fire does not represent “active resistance.” To the extent that Phillips’s perceived conduct could be considered “resistance” at all, it would have been passive noncompliance of a different nature than the struggling that we have found warrants escalation of force. Indeed, in Smith, we noted this distinction, finding that what the officers perceived as willful noncompliance was not the same as “actively resisting” but instead a passive “resistance requiring the minimal use of force.” 295 F.3d at 771 (emphasis added); see also Cyrus, 624 F.3d at 863 (no evidence suggesting that the plaintiff “violently resisted” officers even if plaintiff refused to release arms for handcuffing); Estate of Escobedo v. Bender, 600 F.3d 770, 780-81 (7th Cir.2010) (plaintiff threatening suicide was not actively resisting arrest even though he said he was intoxicated, had a gun, and had barricaded himself in his room and refused to come out for three hours); Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir.2011) (en banc) (“[W]e draw a distinction between a failure to facilitate an arrest and active resistance to arrest.”); Griffith v. Coburn, 473 F.3d 650, 653, 659 (6th Cir.2007) (use of choke-hold on plaintiff who was leaning back but resisting only passively by trying to put arms behind his back and refusing to cooperate with officer’s commands was unreasonable).
The officers have argued that Phillips continued to present a potential threat while she remained in the car because they believed the vehicle was running and could be used as a weapon. We have recognized this risk, Smith, 295 F.3d at 770, and agree that officers were entitled to use force to remove Phillips. But we have never suggested that any level of force is permissible to extinguish such a threat. See McAllister, 615 F.3d at 885-86. To the contrary, “[f]orce is reasonable only when exercised in proportion to the threat posed.” Cyrus, 624 F.3d at 863 (citing Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir.2009)). We must view the severe force that officers used on Phillips in light of the fact that any threat she presented had already been substantially contained. The officers had her vehicle surrounded with seven squad cars, and behind the vehicle there was a steep drop-off. There was nowhere for Phillips to go. Officer Hoffman himself told the dispatch that the driver was “secured, not in handcuffs, but stabilized in the ear.” The scene was “secured” at least fifteen minutes before officers shot Phillips. During that time, Phillips had given no indication that she intended to harm the officers or anyone else.
This is not to say that officers had entirely eliminated all danger after they surrounded the car. But the “desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury.” Deorle, 272 F.3d at 1281. The threat Phillips presented cannot be characterized as “immediate.” See Graham, 490 U.S. at 396, 109 S.Ct. 1865. When the officers decided to use the SL6, Phillips was sprawled across the front seat with her legs outside of the car and both feet on the ground. Even to move into a position to drive the car, Phillips would have had to, at a minimum, sit up, bring her feet in, close the car door, and press the gas pedal. Phillips never gave the officers a reason to believe that she was about to do any of these things, even after the officers fired a warning shot at her car door. Cf. Estate of Starks v. Enyart, 5 F.3d 230, 233 (7th *526 Cir.1993) (finding officers improperly used deadly force and were not entitled to qualified immunity even though escaping arrestee recklessly drove stolen taxicab toward them). Other than taking her legs from the window and putting them outside the car’s door, there was no escalation or change in circumstances that called for immediate action on the officers’ part.
Under the totality of the circumstances, it is a close question whether officers acted reasonably in hitting Phillips with the first SL6 round. But the multiple shots fired certainly exceeded the level of force permissible to effectuate the arrest. Phillips gave no reaction to the first warning shot which put a baseball-sized dent in the car. Then, after the first physical blow, Phillips continued to remain in the same position, only yelling in pain after being injured. She did nothing to escalate the situation by actively resisting or attempting to flee. Although the officers waited little before firing additional shots, it was not because the circumstances called for rapid action. Since Phillips’s only response had been to reach down to her leg and cry out in pain, the officers had time to pause and reevaluate the level of force needed to arrest her. See Mattos, 661 F.3d at 445 (noting that use of less-lethal force was unwarranted because there were no “exigent circumstances” and officers were able to “proceed[ ] deliberately and thoughtfully”); cf. Brockington v. Lomont Boykins, 637 F.3d 503, 507 (4th Cir.2011) (although initial use of deadly force was reasonable, there was no indication that additional force was necessary after the plaintiff had been shot, was on the ground, and wounded).
This was simply not the kind of “tense, uncertain, and rapidly evolving” situation that required “split-second” judgment calls. Graham, 490 U.S. at 397, 109 S.Ct. 1865. As discussed above, the officers had already been put on notice that Phillips’s car was not the same color, make, or model as the one reported stolen. When the car was located, according to the officers’ testimony and the evidence in the record, Phillips appeared to be very drunk. Phillips never actively resisted or even responded to the officers’ initial use of force. Under the circumstances, it was objectively unreasonable to shoot Phillips four times with the SL6 when she posed no immediate threat and offered no active resistance.
There is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity. An arrestee may be physically unable to comply with police commands. See Smith, 295 F.3d at 770; see also Cyrus, 624 F.3d at 863 (noting that officer was “aware of [arrestee’s] mental illness”); McAllister, 615 F.3d at 883 (finding knowledge of arrestee’s diabetic condition relevant to excessive force analysis); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir.2004), (“The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.”).
Here, we must respectfully disagree with our dissenting colleague who suggests that the force used was appropriate because Phillips failed to comply when officers ordered her to exit the car. Like the dissent, we accept the officers’ testimony that their ultimate “goal” in using the SL6 was “to gain compliance and control,” rather than to hurt or punish Phillips gratuitously. But this goes principally to the question of intent. “The officers’ intent in using force is irrelevant in a Fourth Amendment case. Only its reasonableness matters — which means whether it was excessive in the circumstances, because if it was, it was unreasonable.... ” Richman v. *527 Sheahan, 512 F.3d 876, 882 (7th Cir.2008) (citations omitted); see also Graham, 490 U.S. at 397, 109 S.Ct. 1865 (“An officer’s evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer’s good intentions make an objectively unreasonable use of force constitutional.”).
The dissent notes that officers stopped firing after Phillips obeyed and slid out of the car. But the fact that Phillips eventually complied after she was shot has no bearing on whether the force exercised on her was reasonable. We concur with our dissenting colleague’s statement that “the reasonableness of force [cannot be] measured by whether it is successful at gaining compliance.” Dissent Op. at 536. But we believe the dissent’s analysis of the officers’ use of force effectively sanctions this invalid approach. That the officers had a reasonable goal and used (arguably) non-deadly force to accomplish it does not make their actions reasonable. It is true that the officers said they were trained to use the SL6 in an “overload” fashion meant to overpower a subject by repeatedly striking the same area of the body. But as the dissent observes, the SL6 was reserved for “resistive, assaultive, or otherwise dangerous behavior.” Phillips never exhibited any of the active resistance or assaultive behavior that would have warranted use of the overload tactic. Even when officers’ goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers used the force necessary to secure compliance would be a rule that requires officers to beat non-resisting arrestees into submission.
Moreover, we believe the dissent misapprehends the circumstances that warranted escalation of force in our prior cases. We have held that increased force may be reasonable when used in response to an arrestee’s active struggling and in proportion to the threat presented. Thus, in Padula, we found that “[i]t was ... reasonable to use mace to attempt to control [the plaintiff] under the circumstances, which involved a physical struggle both before and after placing him in handcuffs.” 656 F.3d at 603. The force used was carefully calibrated to the arrestee’s active resistance: “as a means of imposing force, pepper spray is generally of limited intrusiveness.” Id. Similarly, “[t]he Officers’ use of batons was also reasonable.... [The] baton strikes were ‘stern,’ but not ‘severe,’ which was appropriate in response to [the plaintiff] kicking and flailing his arms.” Id. Our decision in Clarett v. Roberts followed the same rationale. 657 F.3d 664 (7th Cir.2011). There, an officer testified that he used three taser deployments because the arrestee was “kicking and flailing at him and continued this assaultive behavior when he tried to arrest her.” Id. at 675; see also Monday v. Oullette, 118 F.3d 1099, 1105 (6th Cir.1997) (“Here, [the officer] used only a single burst of pepper spray to get plaintiff on the stretcher, unlike the allegation in [a separate case] that the plaintiff was unnecessarily sprayed a second time after he was subdued.” (emphasis added)). Permitting substantial escalation of force in response to passive non-compliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts. Under the totality of the circumstances, we conclude that the force used surpassed the level permissible under the Fourth Amendment to effectuate Phillips’s arrest.
B. Qualified Immunity
Qualified immunity protects an officer from liability if a reasonable officer could have believed that the action taken *528 was lawful, in light of clearly established law and the information the officer possessed at the time. Omdahl, 170 F.3d at 733. “In determining whether a right is ‘clearly established,’ we look first to controlling precedent on the issue from the Supreme Court and from this circuit”. Estate of Escobedo, 600 F.3d at 781. If such precedent is lacking, we look to all relevant case law to determine “whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.” Id. (internal quotation marks and citation omitted). Even dicta, although we do not rely on it here, in certain cases, can clearly establish a right. See id. at 786 (citing Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).
In undertaking this analysis, we take care to “look at the right violated in a particularized sense, rather than at a high level of generality.” Roe v. Elyea, 631 F.3d 843, 858 (7th Cir.2011) (internal quotation marks and citation omitted). But a case directly on point is not required for a right to be clearly established and “officials can still be on notice that their conduct violates established law even in novel factual circumstances.” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Therefore, we ask whether it was clearly established on November 11, 2005 that multiple trauma-inducing shots would constitute excessive force when used to secure a non-resisting, intoxicated arrestee. We conclude that the right to be free from this amount of force was clearly established on the date of Phillips’s arrest.
The officers contend that they are entitled to qualified immunity because, on the date of the arrest, no case from the Supreme Court or from this circuit had held use of the SL6 unconstitutional. They argue that if the law had clearly established that use of an SL6 was unlawful, police departments would no longer retain the weapon in their arsenal.
The defendants misconstrue the qualified immunity analysis. “[T]here is no need that the very action in question [have] previously been held unlawful.” Safford Unified Sch. Dist. v. Redding, 557 U.S. 364, 129 S.Ct. 2633, 2643, 174 L.Ed.2d 354 (2009) (internal quotation marks and citation omitted). Every time the police employ a new weapon, officers do not get a free pass to use it in any manner until a case from the Supreme Court or from this circuit involving that particular weapon is decided. See Sallenger v. Oakes, 473 F.3d 731, 741-42 (7th Cir.2007) (no qualified immunity for officers’ use of hobble given totality of circumstances, even where other circuits had held that “use of a hobble was not clearly established as constitutionally suspect”). Even where there are “notable factual distinctions,” prior cases may give an officer reasonable warning that his conduct is unlawful. Estate of Escobedo, 600 F.3d at 781; see also Griffith v. Coburn, 473 F.3d 650, 659 (6th Cir.2007) (“[T]he [c]ourt can consider more than merely the factual context of a prior case: ‘the general reasoning that a court employs’ also may suffice for purposes of putting the defendant on notice that his conduct is clearly unconstitutional.” (citation omitted)).
The officers also argue that qualified immunity is warranted because Smith affirmatively authorized use of force to remove an unresponsive driver from a car. 295 F.3d at 771. But the reliance on Smith is misplaced. As we explained in McAllister, Smith does not stand for the proposition that an officer may use any amount of force on an unresponsive driver. 615 F:3d at 885-86 (distinguishing Smith *529 and denying qualified immunity to police officers because “the degree of force the officers intended to apply in Smith was significantly less than the force allegedly used by [the officer in this case]”). To the contrary, Smith permitted only “minimal” force to remove a non-responding intoxicated driver from his car. 295 F.3d at 771.
As stated above, “[f]orce is reasonable only when exercised in proportion to the threat posed.” Cyrus, 624 F.3d at 863 (citing Oliver v. Fiorino, 586 F.3d 898, 907 (11th Cir.2009) (discussing clearly established law as of 2004)). “Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times.” Cyrus, 624 F.3d at 863. By the time of the arrest, circuit precedent had given the officers notice that the force used on Phillips was excessive. Smith indicated that only minimal force was warranted to remove a driver perceived to be intoxicated and passively resisting. 295 F.3d at 771. Omdahl referenced the substantial quantum of force inflicted by a bean-bag shotgun, treating it as either “deadly force” or “a higher level of force along a ladder of escalating force.” 170 F.3d at 733; see also Deorle, 272 F.3d at 1279-80. Prior to Phillips’s arrest, the Eleventh Circuit held in Mercado that officers had used excessive force in deploying an SL6 weapon against an arrestee wielding a knife and threatening to commit suicide. 407 F.3d at 1154-55. One of the two SL6 rounds fired hit the arrestee in the head injuring him. Id. The Eleventh Circuit rejected qualified immunity for the officers even though there was no prior case law that was “materially similar.” Id. at 1159. Though the circumstances surrounding the use of force differ from the current case, Mercado recognized that the SL6 could be deployed in a clearly unlawful manner even though it was categorized as “less lethal.” Id. at 1157.[10]
Even assuming a lack of clarity about the propriety of shooting Phillips with the SL6 once, the officers should have known that it was unlawful to escalate force by shooting Phillips three more times when she was unresponsive, presented no immediate threat, and made no attempt to flee or even avoid police fire. That is, it was clearly established in November 2005 that officers could not use such a significant level of force on a nonresisting or passively resisting individual. Rambo v. Daley, 68 F.3d 203, 207 (7th Cir.1995) (denying qualified immunity where police forced a handcuffed, drunk driving suspect who was verbally resisting arrest into a police car by breaking the suspect’s ribs); St. John v. Hickey, 411 F.3d 762, 772-75 (6th Cir.2005) (denying qualified immunity to officers who injured a disabled plaintiff while placing him in police cruiser because, although the plaintiff was “cursing,” “yelling,” and “passively” resisting, he was not violent or attempting to flee); Hill v. Miller, 878 F.Supp. 114, 116 (N.D.Ill.1995) (“[I]t is well established that the use of any significant force ... not reasonably necessary to effect an arrest — as where the suspect neither resists nor flees or where the force is used after a suspect’s resistance has been overcome or his flight thwarted — would be constitutionally unreasonable.” (internal quotation marks and *530 citation omitted)). We therefore conclude that the officers are not entitled to qualified immunity, and that Phillips is entitled to judgment as a matter of law on her excessive force claim.[11]
III. CONCLUSION
We Reverse the judgment and Remand the case to the district court to enter judgment as a matter of law for Phillips and for a calculation of Phillips’s damages.

. It was later determined that Phillips had bought the Nissan Maxima, after her other car, the Honda Civic, was stolen. The Department of Transportation had reissued the same license plate number for the new Nissan Maxima despite a general policy barring reuse of license plate numbers from stolen cars.

. We note that Phillips did not move for judgment as a matter of law before the case was submitted to the jury as required by Federal Rule of Civil Procedure 50(a)(2). Normally, a party that does not move for judgment as a matter of law before the case goes to a jury loses the opportunity to make this motion after the verdict. See Collins v. Illinois, 830 F.2d 692, 698 (7th Cir.1987). Here, however, the defendants waived objection to Phillips's *519 procedural default by failing to raise this issue on appeal. See id. (considering judgment as a matter of law even though the plaintiff did not move for a "directed verdict” under Rule 50(a) because defendant failed to object); see also Williams v. Runyon, 130 F.3d 568, 572 (3d Cir. 1997) ("Six of our sister circuits have held that where a party did not object to a movant's Rule 50(b) motion specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the party’s right to object on that basis is itself waived.”) (citing cases). Even after Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006), which reemphasized the strict requirements of Rule 50, we have held that "[a party's] challenge to [the opposing party’s] failure to adhere to the procedural requirements of Rule 50(a) ... is waivable.” See Wallace v. McGlothan, 606 F.3d 410, 418-19 (7th Cir.2010) (noting the Supreme Court’s decision in Unitherm).

. Phillips briefly contends, without citing any authority, that whether the officers are entitled to qualified immunity is not properly before us because, although the officers moved for judgment as a matter of law under Rule 50(a) before the jury rendered its verdict, the officers did not renew their motion after the verdict under Rule 50(b). But there was no need for the officers to renew their motion because they were the prevailing parties, having obtained a jury verdict in their favor. See Advisory Committee Notes to Rule 50 (noting that "a jury verdict for the moving party moots the issue”). It would waste time and resources to require a party to move for judgment as a matter of law under Rule 50(b), formerly denominated “judgment notkwithstanding the verdict,” if that party has obtained a jury verdict in its favor.

. The dissent argues that judgment as a matter of law is unwarranted "because the evidence surrounding [an] officer’s use of force is often susceptible of different interpretations.” Dissent Op. at 530 (quoting Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir.2010)). We certainly agree that summary judgment is frequently inappropriate in excessive-force cases. But we do not agree that there are conflicting interpretations of the record that support the amount of force used in this case. Abdullahi v. City of Madison is not to the contrary. 423 F.3d 763 (7th Cir.2005). In Abdullahi, an arrestee suffocated from a lung injury of unknown origin. Medical experts offered dueling testimony at trial as to whether the arresting officers' use of force could have caused the severe lung trauma. Id. at 766-67. Reversing the district court, we held that it was for the jury to infer whether officers caused the injury by kneeling on the arrestee's back or whether the injury was sustained prior to a struggle with police. Id. at 769-70. The current case does not present a similar set of competing facts or inferences. Consequently, "whether four shots was too many under the circumstances” is not a question of factual inferences but a determination of what is objectively reasonable under the Fourth Amendment. Dissent Op. at 530. When warranted, we and our sister circuits have reconsidered jury verdicts in favor of officers for violations of the Fourth Amendment. See Campbell v. Miller, 499 F.3d 711, 718-19 (7th Cir.2007) (reversing jury verdict on reasonableness of strip search in public); see also Manzanares v. Higdon, 575 F.3d 1135, 1144 (10th Cir.2009) (reversing jury verdict on probable cause); Mitchell v. Boelcke, 440 F.3d 300, 303 (6th Cir.2006) (reversing jury verdict on reasonable suspicion to detain plaintiff).

. The amount of force inflicted by four SL6 shots further distinguishes this case from those the dissent relies upon involving use of pepper spray and pain compliance holds. Indeed, in Padula v. Leimbach, we noted that "as a means of imposing force, pepper spray is generally of limited intrusiveness.” 656 F.3d 595, 603 (7th Cir.2011) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir.2002)). The same cannot be said of the force used upon Phillips.

. After dispatch reported the Nissan stolen, Officer Pierce called in for "verification," asking whether "the hit is on a Honda Civic or Maxima," and noting that "the plate number is on a Civic.” Pierce also inquired, “the caller said the car was black for sure? The hit is showing silver.” The dispatcher acknowledged the discrepancy, confirming that the caller who reported the drunk driving had "stated it was a black Nissan Maxima.”

. Phillips also raises a puzzling argument that officers should not have considered her car stolen because the dispatch had made it clear that Phillips was the legal owner of both the Honda and the Nissan. The defendants respond, quite rightly, that they had no way of knowing who was driving the car at the time of the arrest. But this dispute is immaterial. Regardless of the driver’s identity, the question is whether officers reasonably believed the black Nissan was stolen after police dispatch informed them that a silver Honda had been stolen instead.

. By the same rationale, in a case like Smith, if a police dispatch alerted officers that a reported drunk driver also suffered from epileptic seizures, we would expect reasonable officers to take that information into account when weighing the force necessary to effectuate the arrest. See McAllister, 615 F.3d at 883.

. The officers contend on appeal that Phillips "led them on a several mile chase through the City of Waukesha.” This is plainly false. The uncontested evidence at trial established that the officers ' determined Phillips’s location from a bus driver’s call and then found the stationary vehicle on a sidewalk next to an apartment complex. Although the officers searched for the car for several minutes before receiving the tip from the bus driver, there was never any “chase.”

. The officers rely on Mercado to argue that they are entitled to qualified immunity because there was no ''materially similar” case that "truly compels the conclusion that [the plaintiff] had a right established under federal law.” Mercado, 407 F.3d at 1159. The argument is unavailing because Mercado itself found officers liable in spite of the absence of case law directly on point. And the Supreme Court had already rejected any "materially similar” requirement as an overly "rigid gloss” on qualified immunity. Hope, 536 U.S. at 739, 122 S.Ct. 2508.

. Because we conclude that Phillips was entitled to judgment as a matter of law, we do not consider whether she is entitled to a new trial because the district court admitted her blood alcohol content into evidence even though the officers were unaware of it when they shot her with the SL6.