In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-1363

JAMIE BECKER,

*Plaintiff-Appellee,*

*v.*

ZACHARY ELFREICH, individually
and as an Officer of the Evansville
Police Department,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 12-cv-00182 — **William G. Hussman, Jr.**, *Magistrate Judge.*

———————————

ARGUED SEPTEMBER 17, 2015 — DECIDED MAY 12, 2016

———————————

Before FLAUM, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Jamie Becker sued Evansville, Indiana police officer Zachary Elfreich under 42 U.S.C. § 1983, alleging Officer Elfreich used excessive force in arresting him in violation of his Fourth Amendment rights. Becker claimed Officer Elfreich used excessive force because, after Becker had surrendered, Officer Elfreich pulled him down three steps

and placed his knee on his back while allowing a police dog
to continue to bite him. Officer Elfreich moved for summary
judgment, arguing he was entitled to qualified immunity be-
cause his conduct did not constitute excessive force or, alter-
natively, that it did not violate clearly established constitu-
tional law. The district court denied Officer Elfreich's motion
for summary judgment. Officer Elfreich appeals, interlocuto-
rily, arguing that he is entitled to qualified immunity. We con-
clude that based on the record, Officer Elfreich has not estab-
lished that he is entitled to qualified immunity. We affirm and
remand for further proceedings consistent with this opinion.

## I.

On March 11, 2011, four Evansville Police Department of-
ficers went to the home of Brinda Becker in order to execute
an arrest warrant for her son, Jamie Becker, who was staying
at her house at that time. The arrest warrant alleged that three
weeks earlier Becker had held a knife to his brother-in-law's
neck and threatened to kill him. One of the officers dispatched
was Officer Zachary Elfreich, who was a police dog handler.
Officer Elfreich initially guarded the back door of the house
with his German Shepherd, Axel, while other officers went to
the front of the house. While at the rear of the house, Officer
Elfreich saw an individual named Brian Mortis leaving the
home. Mortis told Officer Elfreich that Becker was inside the
house with his mother and her sister, Delores Pfister.

Meanwhile, at the front of the house officers spoke with
Brinda Becker and Pfister, informing them that they had a
warrant for Becker's arrest. Brinda Becker called upstairs to
her son that the police were there to arrest him, and then she
and Pfister waited on the front porch. Brinda Becker also told
officers that Becker was alone in the house. The officers called

Officer Elfreich to the front of the house with Axel. After wait-ing about 30 seconds and not seeing or hearing Jamie, Officer Elfreich released Axel inside the house and directed the dog to "find him."

Officer Elfreich testified that Axel is trained, upon hearing the command "find him," to use the "bite-and-hold" tech-nique. Officer Elfreich explained that using this technique, Axel will bite the first person he finds, even if that person is not the target of the search and even if the person has surren-dered, and hold that person until Officer Elfreich commands him to release. Officer Elfreich further testified that Axel is ca-pable of inflicting "lethal force" and that there is a probability of him doing so.

According to Officer Elfreich, prior to releasing Axel he gave a loud, clear warning: "Police department K-9, come out now or I will release my dog and you will get bit." Officer Elfreich claimed that he listened for a moment and heard nothing so he repeated the warning but after hearing nothing again, he released Axel. Officer Elfreich explained that he un-leashed Axel about 30 seconds after he issued the first warn-ing. Jamie Becker and Brinda Becker both testified that Officer Elfreich did not give a warning. Brinda Becker was on the front porch near the door at the time Officer Elfreich entered and Jamie Becker explained that he would have heard the warning had one been given because there was a vent in his second-floor room which was directly above the front door.

Jamie Becker testified in his deposition that at the time the police arrived he was sleeping upstairs in his bedroom, and upon hearing his mother's announcement that the police were there to arrest him, he replied he was getting dressed and would be down. He further explained that within two

minutes of his mother's announcement, he began descending the stairs with his hands on top of his head so officers knew he was surrendering. Becker's girlfriend followed.[1] As they were descending the stairs, Officer Elfreich released Axel. Axel immediately ran from the front door through the house to the stairway and began heading up the stairs which the duo were then descending. Axel encountered Becker as he reached a landing on the stairs, about three steps from the bottom, and Axel bit Becker's left ankle. At that point Becker shouted, "Call the dog off. I'm coming towards you." Officer Elfreich, who had lost sight of Axel for the two seconds it took Axel to run from the front door to the stairs, then ran to the stairs, following Becker's voice. He saw that Axel had bitten Becker's leg and that Becker had his hands on his head, but did not command Axel to release Becker. Rather, Officer Elfreich ordered Becker to get on the floor. Becker claims he could not hear the command because his girlfriend was screaming. Officer Elfreich then grabbed Becker by his shirt collar and yanked him down the last few steps onto the floor, where he landed hard on his chest and head.

Becker claims that as Officer Elfreich pulled him down the steps Axel lost his grip on his leg, but upon hitting the ground Axel bit him again harder and then continued to bite him while violently shaking his head. Becker testified in his deposition that he lay still on the ground with his hands behind his back, while Officer Elfreich continued to allow Axel to bite his

---

[1] Officer Elfreich testified that based on the officers' conversations with Becker's mother, aunt, and Mortis, they believed Becker was the only person left in the house. He further stated that had he known Becker's girlfriend was also inside, he would not have released the dog.

leg. Becker further explained that Officer Elfreich told him that he could not have the dog release him until he was hand-cuffed. Officer Elfreich placed his knee in Becker's back, hand-cuffed him, and only then ordered Axel to release his grip. Becker was not sure how long Axel bit him, but his girlfriend estimated a few minutes. Either way, Axel severely injured Becker, with Becker's calf "torn out completely." Officers transported Becker to a local hospital for treatment. At the hospital, a member of the medical staff told Becker it was the worst dog bite they had seen in twenty-three years. Becker required surgery and remained hospitalized for two or three days. Becker suffered permanent muscle and nerve damage and continues to suffer daily with pain.

Becker later filed suit against both Officer Elfreich and the City of Evansville. While he alleged several federal and state law claims against the defendants, the only issue on appeal is Becker's Fourth Amendment excessive force claim against Officer Elfreich. Additionally, while Becker had claimed that Officer Elfreich used excessive force in releasing Axel into the house and directing Axel to bite and hold him, the magistrate judge (hearing the case by consent of the parties) granted Officer Elfreich qualified immunity on that claim, and the initial release of Axel is not an issue on appeal. Rather, on appeal is Becker's claim that after he had surrendered with his hands on his head, Officer Elfreich used excessive force by pulling him down the steps and placing his knee on his back while allowing Axel to continue to bite him. While Officer Elfreich also moved for summary judgment on Becker's excessive force claim premised on the post-surrender force, the magistrate judge denied Officer Elfreich's qualified immunity on that claim. Officer Elfreich appeals. Because qualified immunity provides protection both from liability and suit, we have

interlocutory jurisdiction over this appeal. *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

## II.

On appeal, Officer Elfreich argues that he is entitled to qualified immunity on Becker's excessive force claim. "We review the district court's denial of summary judgment on qualified immunity grounds *de novo,* asking whether viewing the facts in the light most favorable to the plaintiff, the defendant[] [was] nonetheless entitled to qualified immunity as a matter of law." *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010). In determining whether a defendant is entitled to qualified immunity, we "undertake a two-part analysis, asking: (1) whether the facts alleged, '[t]aken in the light most favorable to the party asserting the injury, … show the officer's conduct violated a constitutional right'; and (2) whether the right was clearly established at the time of its alleged violation." *Bd. v Farnham*, 394 F.3d 469, 477 (7th Cir. 2005) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### A. Constitutional Violation

In this case, Becker claims Officer Elfreich used excessive force when arresting him. We analyze excessive force claims under the Fourth Amendment's "reasonableness" standard. *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 843 (7th Cir. 2004). "A court determines whether an officer has used excessive force in effectuating an arrest based on a standard of 'objective reasonableness[.]'" *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). "A police officer's use of force is unconstitutional if, 'judging from the totality of circumstances at the time of the arrest, the

officer used greater force than was reasonably necessary to make the arrest.'" *Id.*, 337 F.3d at 778 (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)). Our "inquiry is fact specific and balances the intrusion on the individual against the governmental interests at stake." *Id.*

In conducting this analysis, it is "useful to pin down the quantum of force" used by Officer Elfreich because that "represents the nature and significance of the governmental intrusion" on Becker's Fourth Amendment rights. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). However, as discussed below, at this stage it is impossible to precisely quantify the amount of force Officer Elfreich used—whether it was deadly force, or a lesser quantum of force.

"For a particular application of force to be classified as 'deadly,' it must at least carry with it a substantial risk of causing death *or serious bodily harm*." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 521 (7th Cir. 2012) (emphasis in original) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)). Here, Becker suffered serious bodily harm: Axel tore his calf out, causing permanent muscle and nerve damage. He continues to suffer pain on a daily basis and has difficulty using his leg. While a jury may consider the injury suffered as "evidence of the degree of force imposed," *McAllister v. Price*, 615 F.3d 877, 882 (7th Cir. 2010), there must nonetheless be a substantial risk of serious bodily harm (or death) for the force to be considered deadly. Thus, for example, in *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988), the Sixth Circuit held that the use of a bite-and-hold technique did not constitute deadly force even though the suspect died. The court reasoned that use of the police dog in that case did not carry with it a "substantial risk of causing death or serious bodily harm" because

the dog had been trained to seize suspects by the arm and then wait for an officer to secure the arrestee. Unfortunately, the suspect in that case was hiding under a car and the dog seized him by the only part he could reach—his neck—which caused his death.

In this case, though, based on the record, we cannot determine whether using Axel carried a substantial risk of causing serious bodily injury. Unlike in *Robinette*, Axel did not appear to be trained to bite any specific part of a suspect's body. Rather, when asked if Axel was trained to bite in any specific location, Officer Elfreich responded that the dog would probably bite "the first thing he comes in contact with." Nor does it appear Axel was trained to seize the suspect and then wait for the officer to secure him, as Axel bit Becker twice and the second time ferociously, tearing his calf out. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times."). And Officer Elfreich testified in his deposition that Axel is capable of inflicting "lethal force" and that "there is a probability of him doing so." Whether the probability is a "substantial risk" is unclear from this testimony because we do not know the amount of force Axel was trained to use and whether, in the field, Axel performed as trained. We also do not know whether the cumulative risk created by Officer Elfreich's use of force in pulling Becker down the steps, in conjunction with Axel's continuing to bite him, created such a risk. There are just too many unknowns for this court to conclude, as a matter of law, that Officer Elfreich's use of Axel constituted deadly force.

Of course, that also means that we are not holding the "bite and hold" technique is *per se* deadly force. *See, e.g., Johnson v. Scott*, 576 F.3d 658, 661 (7th Cir. 2009); *Tilson v. City of Elkhart, Ind.* 96 F.Appx. 413, 416 (7th Cir. 2004). Rather, whether a "bite and hold" technique constitutes deadly force "depends on how [the dog] is trained to behave when confronting a suspect. For example, a dog trained to find a suspect and bark until the dog's handler arrives would plainly not qualify as an instrument of deadly force. But a German Shepherd that is behaviorally conditioned to go directly for a suspect's jugular would surely qualify as an instrument of deadly force." *Chew v. Gates*, 27 F.3d 1432, 1453 (9th Cir. 1994) (Norris, J.). *See also id.*, 27 F.3d at 1441–42 (Reinhardt, J.) (noting that a dog trained to "bite and hold" uses "severe" force, but not deciding whether it was "deadly"); *id.* at 1453–55 n.5 (Norris, J.) (concluding that whether the use of a police dog constitutes deadly force is a question of fact). This case, though, does not present either extreme. Rather, based on the record, we cannot say whether the use of the "bite and hold" constituted deadly force. But the force was clearly force at the higher end of the spectrum, and the government's intrusion on Becker's rights was thus significant.

Against this significant intrusion we must balance the government's interest at stake, because "[s]uch force, whether or not it inherently carries a substantial risk of serious bodily harm, 'is not to be deployed lightly.'" *Phillips*, 678 F.3d at 522 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)). In considering the government interests at stake, this court should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively

resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In this case, Becker's underlying crime was a serious felony—he was charged with holding a knife to his brother-in-law's throat. But that alleged crime took place several weeks earlier and there was no evidence that Becker was still armed at the time officers executed the arrest warrant. Officer Elfreich responds that Becker was concealing himself in the house and could ambush officers when they entered the home. That may have justified the officers using Axel initially to locate Becker, but Becker is no longer challenging the initial release of Axel. Rather, Becker argues Officer Elfreich used excessive force by allowing the police dog to continue to bite him after he "had surrendered peacefully and without resistance, …." Appellee Brief at 8.

Reading the facts in the light most favorable to Becker, after his mother told him police were there to arrest him, Becker got dressed and started down the stairs within two minutes with his hands above his head. And just two seconds after he released Axel, Officer Elfreich encountered Becker toward the bottom of the stairs with his hands above his head. At this point, Officer Elfreich should have recognized that Becker was not hiding in the house but was in the process of surrendering. Further, when Officer Elfreich saw Becker on the stairs Becker had his hands in full view over his head and kept his hands there even while being bitten by Axel. Becker did not exhibit any sort of aggressive behavior toward Officer Elfreich or anyone else. *Phillips*, 678 F.3d at 525. Nor was Becker actively resisting arrest or attempting to evade arrest by flight. Accordingly, while the initial release of Axel to find Becker may have been justified because the officers believed Becker was concealing himself in the house, once it became clear that Becker was not concealing himself, but was actually

near the bottom of the staircase about 30 seconds after Officer Elfreich purportedly told him to come down, the force used by Officer Elfreich was no longer reasonable. *Cyrus*, 624 F.3d at 863 ("[A]s the threat changes, so too should the degree of force.")

In response, Officer Elfreich stresses that Becker did not obey his command to get on the ground. Becker claims that, between his girlfriend's screaming and the dog's growling, he did not hear the command. But even if Becker had heard the command, at most Becker's failure to get to the ground—if that were possible with Axel biting his ankle—would "have been passive noncompliance of a different nature than the struggling that we have found warrants escalation of force." *Phillips*, 678 F.3d at 525. "[W]illful non-compliance [is] not the same as 'actively resisting' but instead a passive 'resistance requiring the minimal use of force.'" *Id.* at 525 (emphasis omitted) (quoting *Smith v. Ball Univ.*, 295 F.3d 763, 771 (7th Cir. 2002)).

Officer Elfreich also argues that Becker might have been armed and that until Becker had been handcuffed, he still presented a risk because he might have access to a weapon. However, in every arrest there is a possibility that the individual is armed and that does not justify allowing Axel to continue to bite Becker while Officer Elfreich pulled Becker down the three steps and handcuffed him. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("While it was possible that [the suspect] carried a concealed weapon, as much as it is possible that every felon might be carrying a weapon, [the officer] had no particular reason to believe that [the suspect] was armed."). Further, Officer Elfreich was himself armed and was not alone: There were two other officers in the house by

the time Officer Elfreich reached the staircase, and reading the evidence in Becker's favor, there was another officer in the same room as Officer Elfreich while Axel tore at Becker's leg. Thus, "this is not the case of a single officer attempting to control and detain multiple suspects." *Abbott*, 705 F.3d at 731. "Force is reasonable only when exercised in proportion to the threat posed," *Cyrus*, 624 F.3d at 863, and under the totality of the circumstances, we conclude that a jury could find that Officer Elfreich used excessive force. *See, e.g., Phillips*, 678 F.3d at 527.

Here, we pause to stress that it is the "totality of the circumstances" considered in determining the reasonableness of the force used. *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (internal marks omitted). But the district court considered each aspect of force used separately—the continuation of the bite, Officer Elfreich pulling Becker down three steps, and Officer Elfreich placing a knee in Becker's back while handcuffing him—and found that because Becker had surrendered, each exertion of force, in isolation, was unreasonable. But remove the dog, and Officer Elfreich might have acted reasonably in pulling Becker down three steps and placing a knee in his back to handcuff him. Becker was charged with a serious offense and he did not obey Officer Elfreich's command to get on the ground. There was also the presence of an unknown individual, and the uncertainty of whether Becker was armed. Placing a knee on an individual's back could be deadly depending on the degree of force, but here Becker does not maintain he suffered a back injury. Under the facts as a whole, it was unreasonable for Officer Elfreich to pull Becker down three steps and place a knee in his back while allowing Axel to violently bite his leg.

## B. Qualified Immunity

Taking the facts in the light most favorable to Becker, a jury could reasonably conclude that Officer Elfreich had violated Becker's Fourth Amendment rights by using excessive force in arresting him. Officer Elfreich, however, argues that he is immune from suit because it was not clearly established at the time he arrested Becker that the force he used violated Becker's Fourth Amendment rights.

"[I]t was of course clearly established that a police officer may not use excessive force in arresting an individual." *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2001). But "while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (citation omitted). To be clearly established the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Becker was arrested in 2011, and prior to 2011 it was well-established that "police officers cannot continue to use force once a suspect is subdued." *Abbott*, 705 F.3d at 732. And "it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." *Id.* Further, it was clearly established that only min-

imal force is warranted where the accused is passively resist-
ing. *Phillips*, 678 F.3d at 529. Additionally, we have previously
held that it was clearly established "that officers could not re-
peatedly use an impact weapon to beat into submission a per-
son who was not resisting or was merely passively resisting
officers' orders." *Abbott*, 705 F.3d at 733.

In this case, viewing the facts in the light most favorable
to Becker, he was a nonresisting (or at most passively resist-
ing) suspect when Officer Elfreich saw him near the bottom
of the staircase. Yet Officer Elfreich pulled Becker down the
steps, placed a knee in his back, and continued to allow Axel
to bite him. Case law makes clear that officers cannot use sig-
nificant force on a nonresisting or passively resisting suspect.
Further, as we have often said, "a case directly on point is not
required for a right to be clearly established and 'officials can
still be on notice that their conduct violates established law
even in novel factual circumstances.'" *Phillips*, 678 F.3d at 528
(quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Thus, the
relevant case law did not need to involve a police dog in order
to clearly establish the principle that you cannot allow a dog
to violently attack such a suspect.[2]

In response, Officer Elfreich relies on *Johnson v. Scott*, 576
F.3d 658, 661 (7th Cir. 2009), arguing that in that case this court
"held that allowing a K-9 to continue with a bite and hold un-

---

[2] This case does not involve a split-second delay between the officer
pulling Becker to the ground and directing Axel to release Becker. Rather,
Officer Elfreich had time to tell Becker he would not order Axel to release
him until he was handcuffed, and a witness estimated that the dog con-
tinued to violently bite Becker for up to three minutes.

til an officer secures a suspect with handcuffs is neither un-
reasonable nor unconstitutional." Appellant Brief at 30–31.
Officer Elfreich stresses that in *Johnson*, the arrestee was orig-
inally non-compliant, but "then communicated a willingness
to surrender." Appellant Brief at 31. Yet, as Officer Elfreich
notes, this court held that "not all surrenders are genuine …
and the police are entitled to err on the side of caution when
faced with an uncertain or threatening situation." *Johnson*, 576
F.3d at 659.

Officer Elfreich's reliance on *Johnson* is misplaced. In *John-
son*, police attempted to pull over the suspect in connection
with a reported shooting. The suspect evaded police at first,
but then was stopped by a roadblock. He jumped out of his
car and escaped into a residential yard. It was only when the
suspect was unable to escape over a fence that he turned and
said he was surrendering. At that time a police dog was in
pursuit and about six to eight feet away from the suspect. The
officer allowed the dog to seize the suspect and bite him until
he was handcuffed, about five to ten seconds later. *Johnson*
thus involved a fleeing suspect, wanted for a suspected shoot-
ing which had just occurred. Conversely, in this case, Becker
was not fleeing and officers were attempting to arrest Becker
for a crime which had occurred nearly a month previously;
Becker was out in the open; and he surrendered with his
hands above his head. Further, at the time of Becker's arrest,
the case law was clearly established that more force may be
used for fleeing suspects than for suspects that are at most
passively resisting arrest. Thus, *Johnson* does not alter our
analysis. Rather, the case law clearly establishes that an officer
cannot use more than minimal force given Becker's version of
facts—that he was at most a passively resisting suspect.

### III.

When Evansville police attempted to arrest Jamie Becker, Officer Elfreich released his police dog under the belief that Becker was hiding in the house. However, two seconds later, Officer Elfreich discovered Becker had been descending the stairs to surrender with his hands above his head. Nonetheless, Officer Elfreich continued to allow the police dog to bite Becker, while pulling him down three steps and placing his knee on his back and handcuffing him. And Becker suffered serious bodily injury as a result of the dog bite. While it is unclear from the record whether Axel presented a substantial risk of serious risk bodily harm (and thus deadly force), the force was clearly at the more severe end of the force spectrum. A jury could reasonably find such force was excessive. Further, because it was clearly established at the time of Becker's arrest that no more than minimal force was permissible to arrest a non-resisting, or passively resisting, suspect, Officer Elfreich was not entitled to qualified immunity on this record. For these and the forgoing reasons, we AFFIRM and REMAND for further proceedings consistent with this opinion.