**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-7791**

CHRISTOPHER LAWRENCE MANEY,

Plaintiff – Appellant,

v.

OFFICER TERENCE GARRISON, individually and in his official capacity as an Officer of City of High Point Police Department,

Defendant – Appellee,

and

THE CITY OF HIGH POINT, a municipality; CHIEF JAMES FEALY, individually and in his official capacity as Chief of City of High Point Police Department,

Defendants.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  James A. Beaty, Jr., Senior District Judge.  (1:12-cv-00800-JAB-JEP)

Argued:  January 27, 2016                    Decided:  March 9, 2017

Before TRAXLER, THACKER, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion.  Judge Thacker wrote the majority opinion.  Judge Traxler wrote a separate concurring opinion.  Judge Harris wrote a dissenting opinion.

**ARGUED:** John Carl Vermitsky, MORROW PORTER VERMITSKY FOWLER AND TAYLOR PLLC, Winston-Salem, North Carolina, for Appellant. Patrick Michael Kane, SMITH MOORE LEATHERWOOD LLP, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Corinne B. Jones, SMITH MOORE LEATHERWOOD LLP, Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

THACKER, Circuit Judge:

Late on the night of May 4, 2010, Officer Terence Garrison ("Appellee") and his police dog, Bikkel, tracked a robbery suspect to an apparently abandoned house in High Point, North Carolina. At the front stoop, Bikkel sprang into action, biting an individual crouched behind a nearby bush. Unfortunately, it was not the suspect, but instead Christopher Maney ("Appellant"). In the ten or so seconds that followed, Appellee realized Appellant did not match the physical description of the suspect he and Bikkel were tracking. But he nevertheless feared Appellant might pose a threat to the officers, and so ordered Appellant to show his hands before calling off the dog. During that time, Bikkel continued to bite and hold Appellant for a few seconds.

The district court concluded that Appellee was entitled to qualified immunity from Appellant's excessive force claim, and that a similar form of state-law immunity insulated him from Appellant's battery claim. In reviewing that decision, we must decide whether a police canine handler, whose dog suddenly and mistakenly bites a concealed bystander while tracking the scent of a robbery suspect, clearly violates the Fourth Amendment if he momentarily extends the seizure to assess the potential threat to officer safety. Like the district court, we think the law as it stood on the night in question did not clearly proscribe such conduct. We therefore agree that Appellee is entitled to immunity and affirm.

I.

We recite the facts in the light most favorable to Appellant. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014). Around 10:00 p.m. on the night of May 4, 2010,

3

someone robbed the Sonic restaurant on South Main Street in High Point, North Carolina. Witnesses described the perpetrator as "a clean shaven black male[,] approximately thirty to forty years of age," who had a "bald head," stood "approximately five foot ten inches," and had a "medium build[.]" J.A. 164.[1] He did not use a weapon and fled the scene on foot.

About a mile west of the Sonic, Appellant was bedding down for the night in a temporary camp where "homeless people and persons who are temporarily displaced often set up tents and other structures . . . ." J.A. 228. Unlike the suspect in the robbery, Appellant is white, not bald, and stands approximately five-feet five-inches tall. And, unlike the suspect, Appellant had committed no crime that night.

Appellee and his police dog, Bikkel, were on patrol in the area and joined in the robbery investigation. Bikkel is a Belgian Malinois trained to track and apprehend suspects using the bite and hold technique. That means Bikkel will bite and hold in three circumstances: (1) upon command; (2) if he encounters the suspect he is tracking; or (3) if he or Appellee is under attack.

Appellee spoke with a witness who pointed out the area where the suspect had last been seen running. Appellee then "put Bikkel on that scent, a suspect scent," J.A. 269, and followed behind on a 15-foot lead. The duo plus one additional officer, Riley Edwards, tracked the scent to the homeless camp. Appellee "lit up the area" with his

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

flashlight and gave two verbal warnings that a police canine was in the area. *Id.* at 276. He received no response and saw no movement in the camp.

By that time, Appellant was no longer at the camp because he had been warned by another camp inhabitant that "a group of people w[as] approaching quickly from the railroad tracks on the North side of the camp." J.A. 229. Appellant "had no idea who was coming and was scared," because he "knew at the time that other people in the camp had enemies who . . . could be violent." *Id.* So he fled south on foot and "crouched in the edge of the bushes" adjacent "to the stairs leading up to the front porch" of a nearby residence. *Id.* The bushes were "devoid of foliage and leaves" and the area was illuminated by two street lights. *Id.*

Across the street from the house where Appellant was hiding, Bikkel began "air scenting," which suggested to Appellee that the robbery suspect was nearby. J.A. 288. Bikkel then tracked toward the house and Appellant's position.

During this portion of the tracking, Appellee was trying to be quiet. Appellant could clearly see the officers approaching, but they "did not announce themselves[.]" J.A. 229. Bikkel "climbed the front steps . . . onto the porch," passing within just a few feet of Appellant's position. *Id.* at 230. Appellee followed closely behind with his gun drawn and shortened the lead on the dog to three feet. This gave him more control over the dog's movements. He also scanned the area near the stairs with his gun light, but did not specifically look at the area where Appellant was hiding.

At the top of the stairs, Bikkel air scented again, indicating that the suspect was likely "pretty close." J.A. 296. Appellee's attention was drawn in particular to the door

5

to a crawlspace at the front of the house, which was open. Based on Bikkel's air scenting, he believed the robbery suspect was likely concealed there, under the house. Appellee did not, however, announce himself or warn of Bikkel's presence. For his part, Appellant "was concerned the dog or officers would attack [him] if [he] startled them," so he kept quiet and remained still, crouched in his position beside the stairs. *Id.* at 230.

The unfortunate events that followed unfolded in roughly ten seconds. Appellant maintains he was "visible to the officers where [he] was crouching"[2] when, "[s]uddenly, without warning or provocation," Bikkel "lunged out" from the top step of the porch and "bit [Appellant] on the top of [his] head[.]" J.A. 230. Appellee did not command Bikkel to bite Appellant and there is no evidence Appellee knew Bikkel was going to lunge into the bushes. Bikkel's lunge in the direction of the bushes was also unexpected because the duo had already tracked past that position on their way up the steps to the porch: as Appellee explained, if Bikkel sensed the suspect in the bushes, he should have gone "straight to there[; n]ever up on the porch." *Id.* at 310. But given the indications that Bikkel was tracking the suspect's scent, once Bikkel sprang into action Appellee thought

---

[2] The district court, reasoning Appellant could do little more than speculate about whether he was visible to the officers, did not consider this portion of Appellant's affidavit. But we think it is reasonable to infer that Appellant was visible because the bush he was crouching behind was bare, the area was illuminated by streetlights, and Appellee scanned the area next to the stairs with his gun light as he approached. While Appellant may have been visible, obviously neither Bikkel nor the officer saw him, as neither reacted to his presence when they passed by him, and after they went by him, Appellant remained crouched behind the bush.

6

the "suspect was in the bushes, and Bikkel had just screwed up" by passing that position initially. *Id.*

"Following the initial bite, [Appellee] saw [Appellant] and could see [his] features and skin color."[3] J.A. 230. But "despite being able to see that [Appellant] was not the suspect in the robbery," Appellee "made no attempt to command the dog to stop his attack." *Id.* As Appellee explained, he found it unusual and threatening that Appellant was hiding in the bushes in the darkness and had not identified himself. And, based on Bikkel's air scenting, he also believed the suspect was potentially still near at hand, leaving the officers vulnerable to an ambush. In the tense seconds that followed, Appellee, in an attempt to make sure the person hiding in the bushes was not a threat, repeatedly ordered Appellant to show his hands, while Appellant "attempted to protect [him]self from the dog and pleaded for the police to stop the dog's attack, stating that [he] had done nothing wrong." *Id.* at 231.

Ultimately, Bikkel bit Appellant on the left arm and once more on the left thigh before Appellee "finally told the dog to cease his attack." J.A. 231. The bites left a "two square inch" laceration on Appellant's head and "deep puncture wounds" to his arm and thigh "which led to profuse bleeding[.]" *Id.* at 230–31. When the dust settled, "officers including [Appellee]" placed Appellant in handcuffs, *id.* at 232, called for emergency

---

[3] The district court also declined to consider this statement from Appellant's affidavit. But Appellee's own testimony confirms that he realized during the fracas that Appellant was white and "did not match the physical description of the [robbery] suspect." J.A. 169.

7

medical services in order to give medical attention to Appellant, and discontinued their search of the premises, even though Appellee believed the suspect was in fact under the house or concealed nearby.

In the aftermath, Appellant sued, alleging a violation of his Fourth Amendment right to be free from unreasonable seizure as well as a state-law claim for battery. The district court granted Appellee's motion for summary judgment, holding that although Appellee's use of force may have been unreasonable as a matter of law, an officer in Appellee's position would not have known "that his conduct violated a clearly established right." J.A. 382–84. The district court also concluded that Appellee was immune from the battery claim because Appellant "failed to provide evidence that [Appellee] was acting with a malicious intent to injure [Appellant]." *Id.* at 387–88. This timely appeal followed.

## II.

Our first task is to consider de novo the district court's decision to grant Appellee qualified immunity from Appellant's Fourth Amendment claim. *See Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).

## A.

We begin by acknowledging that Appellant was guilty at worst of being in the wrong place at the wrong time and failing to reveal himself to the police. His seizure accomplished nothing (if anything it impeded the robbery investigation) and it took a painful toll.

8

But qualified immunity protects government officials from liability, even in cases with plainly bad outcomes, if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

Our task, then, is not to ask whether Appellant's injuries are regrettable, as surely they are, but instead whether the facts taken in his favor show (1) that Appellee violated a constitutional right, and (2) that the right was clearly established at the time of the events in question. *See al-Kidd*, 563 U.S. at 735. We have discretion to decide which of those questions to address first "in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236. In many cases it is beneficial to determine first whether the facts establish a violation of the Constitution. *See, e.g.*, *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899–900 (4th Cir. 2016). But in some cases, and this is one, the "constitutional question is so factbound that" deciding it would provide "little guidance for future cases." *Pearson*, 555 U.S. at 237.

We therefore proceed to the second question, keeping in mind that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have

9

understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). In other words, while a case directly on point is not required, "existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullinex v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in original) (internal quotation marks omitted).

B.

Appellant argues any reasonable officer would have known the force used in this case was excessive for three reasons.

1.

First, Appellant maintains that our decisions in *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991), and *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998), clearly establish that it is unreasonable to use a police dog without first giving a verbal warning. In *Kopf*, we reversed a defense summary judgment where officers tracked suspects in an armed robbery to a narrow alley, and released a dog into the enclosure (allegedly) without warning. In doing so, we noted that the parties' factual dispute over the issuance of a warning was "crucial, because a forewarning that the dog is going to attack, which provides the suspects a fair chance to surrender, is more reasonable than a surprise assault." 942 F.2d at 268. Similarly, in *Vathekan*, we reversed an award of summary judgment based on qualified immunity where an officer released his dog into a house where a suspected burglar may have been hiding (again, allegedly) without warning, resulting in severe injuries to the home's owner. As we explained, qualified

10

immunity was not warranted because "it was clearly established [by *Kopf*] that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment." 154 F.3d at 179.

Yet despite the apparent clarity of those holdings, our subsequent decision in *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010), cast serious doubt on the breadth of the warning requirement set forth in *Kopf* and *Vathekan*. In *Melgar*, an officer used a police dog trained in the bite and hold technique to search for a missing teenager in distress. Although the officer kept the dog leashed at all times, the canine nevertheless found the boy, bounded into the bush beneath which he was hiding, and bit him on the ankle causing serious injury. Like Appellant, the *Melgar* plaintiff asserted the officer's use of the dog violated the clear warning requirement set down in our prior cases. We acknowledged that "*Vathekan* and *Kopf* . . . establish[ed] that a warning is necessary before releasing a dog," but identified a "vast difference between an officer releasing a dog off a leash . . . and an officer exercising substantial control over a leashed animal." 593 F.3d at 358. As a result, we granted the officer qualified immunity on the theory that "[c]ases addressing the former simply do not provide sufficient guidance to officers in the latter situation." *Id.*

We have serious doubts about the propriety of that distinction. As this case shows (and, indeed, *Melgar* itself showed), a leashed dog may be easier to control to some extent, but can nevertheless do serious damage if it tracks, locates, and ultimately bites and holds a suspect. *See also Kuha v. City of Minnetonka*, 365 F.3d 590, 595–96 (8th Cir. 2003) (leashed dog "bounded into the three-foot-high grass and 'seized'" suspect),

11

*abrogated on other grounds by Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007) (en banc). But whatever our reservations, there is no denying that Melgar muddied the question of whether officers must issue warnings when utilizing police dogs on leash, as Appellee did here. Indeed, the rule Appellant maintains was clearly established -- that an officer must warn before using a canine, whether on leash or off -- was forcefully articulated in the *Melgar dissent*, rather than the majority opinion. *See Melgar*, 593 F.3d at 363 (Michael, J., dissenting) (arguing that officer "deployed" his canine despite keeping it leashed where the dog was used in part for the deliberate purpose of finding a lost teenager). As a result, we cannot say that any reasonable officer would have known he was required to warn of Bikkel's presence as he approached Appellant's position.

2.

Appellant next argues *Kopf* clearly established that it is unreasonable to prolong a dog bite seizure until a subject complies with orders to surrender. In that case, two suspects fled the scene of an armed robbery and hid in an "extremely narrow" enclosure between a shed and an adjoining fence. *Kopf*, 942 F.2d at 266. Police had reason to believe the suspects might be armed, so a canine handler released a police dog into the passageway, where he first bit the female and then the male suspect. The canine officer called on the suspects to show their hands, but they did not. Two additional officers then entered the corridor and began struggling with the male suspect. The canine handler at that point recognized that the male suspect was unarmed but still did not command the dog to release his hold. Instead, he joined his fellow officers in the enclosure, where all three struck the suspect several times with blackjacks and flashlights.

12

By the time it was all over, the suspect had been "nearly beaten to death." *Kopf*, 942 F.2d at 269. He was "frightfully mauled," and arrived at the hospital in "critical condition" with a fractured skull, subdural hematoma, and "lacerations of the upper lip, chest, knee, leg, and scrotum." *Id.* at 267. Under those circumstances, we expressed our belief "that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum." *Id.* at 268. But we ultimately held that qualified immunity was inappropriate because the undisputed facts did not "portray an extraordinary situation" justifying the "severe" and "extraordinary force" allegedly used by the officers. *Id.* at 269.

Here, the district court reasoned that *Kopf* did not put the constitutional question about Appellee's conduct in this case beyond debate because in *Kopf* we "only found that a jury may conclude that forcing a person to show his hands prior to calling off the police K-9 is excessive force," but did not state "definitively that such conduct did in fact amount to a constitutional violation." J.A. 383. The district court's view is not unfounded. Once a court has "viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *see also Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Our suggestion that a jury "could" find the officers' conduct in *Kopf* objectively unreasonable might, therefore, be read as equivocation on a mixed question of law and fact rather than a definitive statement that certain conduct violates the Fourth Amendment.

13

But we need not rest our holding on the ambiguity in *Kopf*'s language. Like the district court, we think the facts of *Kopf* are too dissimilar from this case to provide adequate guidance to an officer in Appellee's position. The officers in *Kopf* were dealing with an armed robbery suspect, albeit one who they knew was unarmed, outnumbered, and effectively cornered by the time they asked him to surrender. And although the suspect was fighting with the dog, he was also being subdued by three officers who were hitting him with flashlights and blackjacks while the police dog continued to bite him on the scrotum, among other areas. In other words, the officers were confronted with a clearly unarmed suspect who was going nowhere; they outnumbered him and were beating him into submission; and yet they chose to allow the dog to continue biting the suspect in the most sensitive of areas.

By contrast, here, Appellee suddenly and unexpectedly found himself in relatively close quarters with an unknown and concealed individual who had been hiding in the area where Appellee expected to find the perpetrator of a recently committed robbery and assault. Although Appellee quickly realized Appellant was not the suspect, he could also reasonably have believed, based on Bikkel's air scenting, that the potentially dangerous criminal suspect was in fact still nearby. And it is undisputed that he quickly called Bikkel off within just a few seconds after calling for Appellant to show his hands. Unlike *Kopf*, there is no indication that Appellee gratuitously prolonged the biting after determining that Appellant was unarmed and surrendering. *Cf. Cooper v. Brown*, 844 F.3d 517, 521, 523 (5th Cir. 2016) (affirming denial of qualified immunity where police dog "continued biting [the nonresistant suspect] for one to two minutes"; officer did not

14

command the dog to release his bite until suspect had rolled onto his stomach and was in handcuffs; and officer had "no reason to believe that [the suspect] posed a threat"); *Becker v. Elfreich*, 821 F.3d 920, 929 & n.2 (7th Cir. 2016) (holding that allowing a police dog to continue biting while the officer pulled a nonresistant suspect down the stairs and knelt on his back clearly violated the Fourth Amendment, but specifically noting the case did "not involve a split-second delay between the officer pulling [the suspect] to the ground and directing [the dog] to" stop biting).

Under those circumstances we think an objective officer familiar with *Kopf* could reasonably, even if mistakenly, have believed that he was not required to call Bikkel off for the eight or so seconds that it took to surmise that Appellant posed no immediate threat to officer safety. *See Kuha*, 365 F.3d at 600–01 (holding it was not unreasonable for officers to extend a dog bite seizure for ten to fifteen seconds while searching the area around an unarmed suspect who nevertheless inexplicably fled from a minor traffic stop). In the end, whatever *Kopf* may say about the likelihood that a suspect will calmly surrender while being bitten by a dog, the case is simply too factually dissimilar to place the situation facing Appellee beyond constitutional debate. Accordingly, we agree with the district court that Appellee's decision to briefly prolong Bikkel's seizure of Appellant did not violate a constitutional right that was clearly established by *Kopf*.

3.

Appellant's final argument, quite apart from *Kopf* and *Vathekan*, is that every reasonable officer would have known that the use of *any* force was unreasonable here because there was no basis for seizing Appellant in the first instance.

15

This argument requires us first to determine when the seizure began. "The Supreme Court has explained that a Fourth Amendment seizure requires 'an intentional acquisition of physical control' which occurs 'only when there is a governmental termination of freedom of movement *through means intentionally applied*.'" *Melgar*, 593 F.3d at 354 (quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 596, 597 (1989)). To be sure, a seizure may occur "even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful," rather than the product of "an unknowing act." *Brower*, 489 U.S. at 596. In other words, "one is 'seized' within the [F]ourth [A]mendment's meaning only when one is the *intended object* of a physical restraint by an agent of the state." *Rucker v. Harford Cty.*, 946 F.2d 278, 281 (4th Cir. 1991).

Here, several facts suggest Appellee did not initially intend to seize Appellant. First, Appellee not only kept Bikkel on a leash as he approached the area where Appellant was hiding, but also shortened the leash, presumably to exert greater control over the dog's movements. Second, Appellee did not know anyone was hiding in the bushes (instead believing the robbery suspect was hiding under the house), and he did not expect Bikkel to lunge towards the bushes, because the dog had already tracked past that location without alerting or springing into action. Finally, it is undisputed that Appellee did not command Bikkel's first bite; instead, as even Appellant suggests in his affidavit testimony, the dog "[s]uddenly, without warning or provocation . . . lunged out" from the top step of the porch. J.A. 230. All of this suggests that, so far as Appellee was concerned, the first bite was spontaneous and unexpected. And as a result, we think

16

Appellant did not become the intended object of a seizure for Fourth Amendment purposes until Appellee realized what had happened but nevertheless declined to call off the attack. *Cf. Dunigan v. Noble*, 390 F.3d 486, 492–93 (6th Cir. 2004) (no seizure where officer did not command dog to bite and dog reacted instead to a bystander entering the "dog's defensive perimeter"). The question, then, is whether every reasonable officer would have known the second and third bites were clearly unreasonable.

A brief detention for investigative purposes is reasonable if an officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also Turmon v. Jordan*, 405 F.3d 202, 205 (4th Cir. 2005). "Considering the totality of the circumstances, we are to determine whether there was a sufficient objective, particularized basis for suspecting the person seized of criminal activity." *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). "Evidence that would support only a mere hunch is insufficient, though a reasonable basis need not establish probable cause and may well fall[ ] considerably short of satisfying a preponderance of the evidence standard." *Id.* (internal quotation marks omitted). "[R]elevant to the totality of the circumstances are various individual factors traditionally relied upon by police officers, such as whether the stop occurred in a high-crime area, or whether the suspect engaged in evasive behavior or acted nervously." *United States v. Mayo*, 361 F.3d 802, 805–06 (4th Cir. 2004) (internal citation omitted).

17

The fact that an individual happens to be near to where police suspect criminal activity is taking place, standing alone, does not provide reasonable suspicion to stop just anyone in the area. *See Mayo*, 361 F.3d at 807. But that is not what happened here. Instead, Appellant was crouching in the dark behind a bush in the immediate location where, based on Bikkel's tracking, Appellee expected to find the suspect in a recently-committed robbery and assault. And while it is true that Appellee quickly realized Appellant was not the suspect, we can hardly say there was nothing suspicious about the situation or Appellant's behavior.

Indeed, given that Bikkel confused Appellant's scent for the suspect's, we think a reasonable officer could have believed the two were hiding together or had recently been in close contact.[4] And although there were no reports of the robbery suspect acting with an accomplice, Appellant was also actively hiding from the police as they approached, behavior which we have previously found can contribute to an officer's reasonable

_____

[4] This point bears emphasis. Some police dogs are trained to bite the first person they encounter, making no distinction between suspects and bystanders. *See, e.g.*, *Lowry v. City of San Diego*, 818 F.3d 840, 849 (9th Cir. 2016) ("Bak was not trained to differentiate between a young child asleep or . . . a burglar standing in the kitchen with a butcher knife, and would simply bite the first person she found." (quotation marks omitted)), *reh'g en banc granted*, 837 F.3d 1014 (9th Cir. 2016). But Appellee repeatedly testified, and it is undisputed in the record, that, unless he is ordered to do so or responding to an attack, Bikkel will not bite unless he smells the scent of the subject he is tracking. *See, e.g.*, J.A. 270 ("Q: So if he's not smelling that person, he won't bite the person? A: Correct."). Given this distinction, we think a reasonable officer would be entitled to draw certain inferences from Bikkel's actions that could not be drawn from the actions of a less discerning dog.

18

suspicion.[5]  *See, e.g.*, *United States v. Sims*, 296 F.3d 284, 286–87 (4th Cir. 2002) (upholding *Terry* stop where an individual was found crouching and hiding around a corner "a very short distance from the spot where a shot was reportedly fired").  Given the totality of those circumstances, we cannot say it would have appeared beyond debate to any reasonable officer that there was no reasonable suspicion to conduct an investigative stop.  For example, we think Appellee could have reasonably, if mistakenly, suspected Appellant was hiding with and helping to conceal the robbery suspect and thus an accessory after the fact.  *See* N.C. Gen. Stat. § 14-7.

And we do not think it would have been patently obvious to any officer that briefly using a police dog in the situation presented here would necessarily violate the Fourth Amendment.  It is true that *Terry* stops can, and generally should, be minimally intrusive.  *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).  But "the right to make an arrest *or investigatory stop* necessarily carries with it the right to use some degree of physical coercion . . . to effect it."  *Graham*, 490 U.S. at 396 (emphasis supplied).  Officers conducting *Terry* stops may, therefore, "use such reasonable force as may be necessary to" effectuate the stop, *United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987), "to maintain the status quo[,] and to protect their safety," *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993) (holding that officer's decision to draw his weapon

---

[5] The dissent would omit this fact from the reasonable suspicion analysis altogether, on the theory that Appellant's rationale for not identifying himself -- fear that he would be bitten -- ultimately proved correct.  I fail to see how that matters.  The question is whether Appellant's decision to remain hidden would have appeared suspicious to a reasonable officer.

during a *Terry* stop was not improper even though the officer "had no reason to believe [the suspects] were armed and dangerous"); *see also, e.g.*, *Young v. Prince George's Cty.*, 355 F.3d 751, 755 (4th Cir. 2004) (citing prior cases upholding the use of handcuffs and drawing of weapons during *Terry* stops).

To be sure, a bite from a police canine is a significant use of force. *See Melgar*, 593 F.3d at 362 (Michael, J., dissenting). And we have long held the use of other significant forms of force, whether "from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured." *Meyers v. Baltimore Cty.*, 713 F.3d 723, 734–35 (4th Cir. 2013) (discussing prior precedent). Unsurprisingly, then, courts have denied qualified immunity to officers who use dogs on suspects who have genuinely surrendered, *see Becker*, 821 F.3d at 929, or immediately complied with police orders to do so, *see Alicea v. Thomas*, 815 F.3d 283, 290 (7th Cir. 2016).

Had Appellee encountered Appellant in broad daylight with time enough to call on him to surrender, or had Appellant announced his presence to the approaching officers and emerged from his hiding place with hands raised, this case would present an entirely different question. Instead, Appellee had every indication that the suspect in an assault and robbery was concealed somewhere in the darkness nearby, when Bikkel, who was tracking the suspect's scent, suddenly sprang into action. In the seconds that followed, Appellee determined Bikkel had not seized the suspect. But the resolution of that uncertainty understandably gave rise to more questions: Who was this person crouching behind a bush, in the dark, near an abandoned house? Why did he continue hiding as

20

police approached?  Why did Bikkel confuse him for the suspect?  Was he acting in concert with the suspect?  Was the suspect still in fact nearby?  And, in about as much time as it takes to type (let alone to answer) those questions, Appellee sought to resolve perhaps the most pressing uncertainty of all -- whether the unknown individual hiding from police, in the spot where Bikkel had tracked the robbery suspect, was a threat to officer safety.  As soon as Appellee determined the answer to that question was "no," it is undisputed that he called Bikkel off and restrained the animal.

In sum, Appellee was faced with a situation that was tense, uncertain, and rapidly evolving -- precisely the context in which the Supreme Court has counseled us to make allowances for on-the-scene decisions about the amount of force that is necessary, "even if it may later seem unnecessary in the peace of a judge's chambers[.]"  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (internal quotation marks omitted).  Once he ascertained that Appellant posed no threat and was not resistant, Appellee discontinued the use of force, even though a reasonable officer could have considered Appellant's connection to the robbery suspect and reasons for hiding from the police as yet open questions.  Under those circumstances, we cannot say that every reasonable officer would have known his conduct was, beyond question, a violation of the Fourth Amendment.[6]

---

[6] Appellant made passing reference in his briefing to the district court and this court to the fact that the officers, including Appellee, handcuffed him for some period of time while they treated his wounds and waited for emergency medical services personnel to respond.  Because Appellant failed to develop this argument to any extent in his brief, we consider it waived.  *See Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 152 n.4 (4th Cir. 2012).

21

C.

Judge Harris laments the severity of the force employed in this case, and understandably so. One need not look far beyond each morning's newspaper to find alarming examples of police officers using force in ways that should give us -- as citizens and as judges -- cause for concern. This case is no exception. That is why I would not hold, much less suggest, that Appellee's deployment of Bikkel complied with the Fourth Amendment.[7]

But current events remind us, too, that threats to officer safety are not imaginary, and that police are often asked to intervene at a moment's notice in tense, difficult situations, on the basis of imperfect information and with little time for deliberation. That is why we do not engage in "unrealistic second-guessing" of action taken in swiftly developing situations, *United States v. Sharpe*, 470 U.S. 675, 686 (1985), and why we do

---

[7] For this reason I find curious the dissent's critique of our "rule" as it relates to the timing of Appellee's decision to call off the dog. *Post* at 47 n.5. It may be, as Judge Harris suggests, that the use of force became unconstitutional the very second Appellee realized Appellant was not his suspect. Perhaps not. I would simply leave that question for another day, establishing no rule at all -- one way or the other. The timing of the events in question is, however, relevant to the question we do answer: whether every reasonable officer in Appellee's shoes would have known his conduct violated the Fourth Amendment. Some cases (ours and others) have made clear that gratuitously prolonging the use of a police dog *is* unconstitutional. *See, e.g.*, *Kopf*, 942 F.2d at 267–69 (no qualified immunity where officer continued to allow dog to bite clearly unarmed suspect that was surrounded by several officers who were beating the suspect into submission); *Becker*, 821 F.3d at 929 & n.2 (no qualified immunity where officer allowed dog to continue biting after pulling a nonresistant suspect down the stairs and knelt on his back). Critically, though, what those cases do not say is that it is per se gratuitous for an officer to make a split-second decision to use a dog to preserve the status quo when the tense, rapidly-unfolding pursuit of a suspect suddenly escalates into the spontaneous seizure of a concealed bystander.

not subject officers to personal liability for "bad guesses in gray areas," *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

Our task instead is to assess whether Appellee ran afoul of bright constitutional boundaries. In the dissent's view, the common sense answer is clearly "yes." I agree that common sense should guide our decision making. And when three judges consider the same set of facts and in good faith take three different views of the law, common sense tells me that things may not be as clear to every cop on the beat as the dissent would suggest.

For example, a reader of the dissent's cogent discussion of *Terry*'s stop and frisk procedure could be forgiven for believing it well-settled that "a limited pat-down of a suspect's outer clothing . . . is all" the physical contact an officer may ever make with a suspect on the basis of reasonable suspicion. *Post* at 41. That is certainly all that should happen in the ordinary case. But as the dissent acknowledges, a "standard *Terry* stop . . . is not what happened here." *Id.* at 40. And an officer executing a seizure on the basis of reasonable suspicion under considerably more exigent circumstances would be surprised to learn that a frisk is all the physical contact permitted. In fact, when the classic *Terry* tableau is replaced by something more dynamic, we and others have sanctioned stops involving far more force. *See United States v. Haye*, 825 F.2d 32, 33–35 (4th Cir. 1987) (officer acting on reasonable suspicion chased, tackled, and forcefully handcuffed a suspect); *United States v. Dykes*, 406 F.3d 717, 720 & n.2 (D.C. Cir. 2005) (same and collecting cases from other circuits); *see also United States v. Lawshea*, 461 F.3d 857, 860 (7th Cir. 2006) (using a police canine to stop and bite a fleeing suspect did not

23

convert *Terry* stop into custodial arrest requiring probable cause).  True, those cases mostly involve fleeing suspects, which Appellant was not.  But discovered so suddenly and unexpectedly as he was -- in circumstances a reasonable officer could have mistaken for lying in wait -- the situation was unusual enough that this case cannot be resolved by simply pointing out the differences between an ordinary *Terry* stop and what happened here.

As one of our sister circuits explained over two decades ago, we have seen an "expansion of *Terry*, including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory detention." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (internal quotation marks omitted).  "For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *Id.* at 1224–25.  That trend may well be for the worse.  But it unquestionably blurs the lines about the degree of force that *Terry* permits.  That "latitude . . . to neutralize potentially dangerous suspects" may not stretch far enough to cover what happened here (a question which, again, I do not resolve).  But under the tumultuous, spontaneous, and unexpected circumstances of this case, I do not think the answer is as obvious as my dissenting colleague sees it, and that is what matters for purposes of qualified immunity analysis.

None of that, however, should be taken as minimizing the impact of these events on Appellant, who did not deserve the misfortune that befell him.  Nor do I mean to

24

imply that officer safety is more important than citizen safety. Both are important interests; when in tension they must be carefully balanced. Our conclusion that Appellee is entitled to qualified immunity simply reflects one way in which we strike that balance: by affording officers "breathing room to make reasonable" even if "mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. Like the district court, I cannot say Appellee acted perfectly under the circumstances. But by the same token I cannot say his actions rose to the level of plain incompetence or knowing violations of the law. And so, like the district court, I conclude that Appellee is entitled to qualified immunity.

III.

Finally, we briefly consider whether the district court properly granted Appellee state-law immunity from Appellant's battery claim.

"Under North Carolina law, public officials engaged in discretionary, governmental duties enjoy absolute immunity from personal liability so long as they keep within the scope of their official authority and act without malice or corruption." *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003) (citing *Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984)). "[A]n officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty.'" *Id.* (quoting *Grad*, 321 S.E.2d at 890).

Appellant argues that Appellee's conduct was "malicious in that it was in reckless disregard to [his] rights and safety." Appellant's Br. 21. But having determined that Appellee transgressed no clearly established constitutional boundaries, that theory of maliciousness fails. *See Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013)

25

(explaining that state law "man of reasonable intelligence standard" is "functionally identical" to federal "clearly established" standard). And Appellant's remaining theory, that Appellee actually wantonly intended to injure him, is, as the district court held, unsupported by even Appellant's version of the facts. Accordingly, we agree with the district court's conclusion that Appellee is immune from Appellant's battery claim.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

TRAXLER, Circuit Judge, concurring:

I agree with Judge Thacker that the district court correctly granted summary judgment against Maney on qualified-immunity grounds because it was not clearly established on the night in question that Maney's conduct was unconstitutional. Because my analysis of this issue differs somewhat from Judge Thacker's, I write separately regarding that issue.[1]

The doctrine of qualified immunity "balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (internal quotation marks omitted).

In determining whether an officer is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry.[2] *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam). The first asks whether the facts, viewed in the light

---

[1] I concur in Part III of Judge Thacker's opinion, concerning the battery claim.

[2] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

27

most favorable to the plaintiff, show that the officer's conduct violated a federal right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The second prong of the qualified-immunity inquiry asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional. *See Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006). "We do not require a case directly on point" in order to conclude that the law was clearly established so long as "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

A claim that a police officer employed excessive force is analyzed under the Fourth Amendment under an "objective reasonableness" standard. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *see Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). The officer's actions do not amount to excessive force if they "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham*, 490 U.S. at 397. In considering the reasonableness of an officer's actions, we must consider the facts at the moment that the challenged force was employed. *See Henry*, 652 F.3d at 531.

Evaluating the reasonableness of the officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests

28

against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). To properly consider the reasonableness of the force employed we must "view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) (internal quotation marks omitted). We also must give "careful attention to the facts and circumstances of each . . . case, including" three factors in particular: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Considering these factors in regard to Garrison's actions, I cannot say that a reasonable officer in Garrison's position would have known that his actions violated the Fourth Amendment. To begin, the crimes at issue were violent. The suspect that Officer Garrison was tracking had committed a robbery and assaulted a woman in the process. Indeed, common-law robbery constitutes a felony in North Carolina. *See* N.C. Gen. Stat. § 14-87.1; *see also Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault.").

Second, Garrison had reason to perceive that the suspect he was tracking was a significant threat to his own safety and the safety of his backup officer. The suspect already had disregarded public safety by assaulting a female during his commission of the robbery. And he had had time to gain a tactical advantage over the officers by taking a position of cover in anticipation of their arrival. In the darkness of the night, Garrison justifiably feared that he and his backup were vulnerable to a surprise attack.

Finally, there can be no doubt that the suspect Garrison was tracking was attempting to flee.

When Bikkel suddenly lunged out at a person apparently hiding in the bushes, Garrison understandably believed Bikkel had found the suspect. With Garrison having been caught by surprise, attempting to negotiate the darkness, and suddenly faced with a figure hiding in an area where Garrison expected to find the robbery suspect, Garrison reasonably could have concluded that the person posed a risk of immediate danger to his and his backup's safety. *See Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 905 (4th Cir.) (noting that "a police officer may *only* use serious injurious force . . . when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force"), *cert. denied*, 137 S. Ct. 61 (2016). And this perception of severe danger would not necessarily have been allayed by the discovery that the man hiding in the bushes was not the robbery suspect. As Judge Thacker ably explains, Garrison had reason to suspect that the man in the bushes was acting in concert with the suspect and that the suspect was

still nearby.[3] *See ante* at 18-19. Facing a suddenly developing threat, Garrison could have reasonably believed that calling Bikkel off before confirming that the hiding man was not armed would subject him and his backup to significant danger, and thus that prolonging the seizure a few seconds was justified. *Cf. Kuha v. City of Minnetonka*, 365 F.3d 590, 600-01 (8th Cir. 2004) (holding, regarding officers pursuing a suspect who had fled from a traffic stop and given no indication that he was armed, that no jury could rationally conclude that the officers acted unreasonably in extending dog-bite seizure for 10 to 15 seconds while the officer handling the dog demanded that the suspect raise his hands), *abrogated on other grounds*, *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395-96 (8th Cir. 2007) (en banc). "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Elliott v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1996).

While the violence that Bikkel had the potential to inflict – and did inflict – was no doubt substantial, a reasonable officer in Garrison's position would distinguish his situation from one in which an officer "sicc[ed] a police dog on a manifestly unarmed and compliant suspect." *Cf. Kuha*, 365 F.3d at 601 (emphasizing this difference in

---

[3] Maney argues that the dog-bite seizure, or at least the part that occurred after Officer Garrison realized it was happening, was unconstitutional because it was not supported by reasonable suspicion that Maney was involved in criminal activity. Assuming *arguendo* that such reasonable suspicion was necessary to justify the brief continuation of the dog-bite seizure, I agree with Judge Thacker that a reasonable officer in Garrison's position could have believed that requirement was satisfied. *See ante* at 18-19.

holding that no rational jury could find officer's actions in prolonging the dog-bite seizure were unconstitutional). Indeed, Garrison promptly called off his dog only seconds later, as soon as he was able to see that Maney was not holding a weapon. *See* J.A. 284 (testimony that Garrison took Bikkel off in one to two seconds once he saw Maney was not holding a weapon). *Cf. Becker v. Elfreich*, 821 F.3d 920, 929 n.2 (7th Cir. 2016) (holding that continuation of dog-bite seizure constituted excessive force but emphasizing that the case did "not involve a split-second delay between the officer pulling [the suspect] to the ground and directing" the dog to end the seizure). Furthermore, nothing in the record indicates that Garrison took an unreasonable amount of time to make that determination.

Maney maintains that *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991), would have alerted any reasonable officer that it was unconstitutional to demand that Maney show his hands before calling Bikkel off. Maney particularly focuses on our statement in that case that a jury could rationally "find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum." *Id.* at 268. But the context of that statement shows that it did not establish the unconstitutionality of Garrison's actions. In *Kopf*, the biting of the suspect to which we referred occurred *after the officer handling the dog realized that the suspect was not holding a weapon. See id.* at 266 ("[The officer handling the dog] did not order [the dog] to release; instead, noting that [the suspect] had no weapon in his hands, [the officer handling the dog] ran back around the shed to assist [the two other officers]. [The suspect] struggled with the dog [and the two other officers]. By this time, [the dog] was biting [the suspect] in the thigh

32

and groin; still [the officer handling the dog] allowed the biting to go on."). Our statement was made in the context of explaining that a jury, in determining the reasonableness of the force the officers employed, might rationally conclude that the suspect *should not be faulted* under those circumstances for continuing to offer some resistance to the dog's attack. *See id.* at 268. To a reasonable officer in Garrison's position, *Kopf* would have, at most, established that Maney's refusal to immediately show his hands should not be interpreted as an act of aggression or noncompliance. It would not have alerted him that it would be unconstitutional to briefly prolong the dog-bite seizure while he determined that the man he reasonably viewed as a serious threat to him was not holding a weapon. *See Kuha*, 365 F.3d at 600-01 (noting that while the officers knew that the officer who made the traffic stop from which the suspect fled had not seen a gun, the officers were nonetheless "reasonably wary of what they might encounter when they found [the suspect]," and they were "reasonably concerned for their safety").

Maney further argues that *Kopf* and *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998), would have alerted any reasonable officer in Garrison's position to the fact that Garrison acted unconstitutionally by not giving a verbal warning as he approached the house. He particularly notes that *Vathekan* stated that "Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context" and that "it was clearly established in 1995 that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth

33

Amendment." *Id.* at 179. In my view, however, these statements were not sufficient to put a reasonable officer on notice a warning was constitutionally required as Garrison approached.

As Bikkel started air scenting across the street from the house and Garrison sensed that the suspect was pretty close, he made the judgment that attempting to be quiet, and thereby retaining the element of surprise, would provide important protection against a sudden and unexpected attack from a suspect whose location Garrison had not yet identified. J.A. 331-32; *see Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (noting that courts should not "undercut the necessary element of judgment inherent in a constable's attempts to control a volatile chain of events"). This judgment was certainly not an unreasonable one. *Cf. Kuha*, 365 F.3d at 603 (reasoning that in situation in which suspect was hiding in a location unknown to the officers, reasonable officer could conclude that "a warning would place the officers at undue risk"; distinguishing *Kopf* and *Vathekan*). And importantly, as Garrison and Bikkel climbed onto the porch, Garrison, unlike the officers in *Kopf* and *Vathekan*, did not release his dog. In fact, Garrison shortened Bikkel's lead from 15 feet to three feet to increase his control over the dog and to reduce the chance that Bikkel would encounter and bite a bystander. On that basis, an officer in Garrison's position could have reasonably believed he was not violating the rule articulated in *Vathekan* requiring the issuance of a warning *before releasing a dog*. Indeed, we relied on this very distinction in *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010). Specifically, we noted the "vast difference between an officer releasing a dog off a leash knowing with a good degree of certainty that it will find and

34

bite its target and an officer exercising substantial control over a leashed animal with the expectation of being able to prevent any injury." *Id.* at 358. On that basis, we held that the officer did not violate clearly established law for failure to give verbal warning while tracking with his dog on a 15-foot lead because "the officer expected his control over the animal by means of the leash would render any warning unnecessary." *Id.*

Nor do I believe that *Kopf* and *Vathekan* would have instructed a reasonable officer that a warning – and cessation of the dog-bite seizure – was necessary once Garrison realized the dog had engaged someone. By that time, Garrison was suddenly facing an emergency situation. Despite the breadth of the language from *Vathekan* requiring warnings before the deployment of a dog, nothing in *Vathekan* – or *Kopf* – concerned a potential serious and immediate threat to the officer. In *Vathekan*, when the dog was released, officers had already established a perimeter around the house in which they believed the suspect was located and there clearly was no immediate threat to any of those officers. *See* 154 F.3d at 176. In *Kopf*, as well, several officers were out of harm's way and had cornered the suspects behind a shed when the dog was released. *See* 942 F.2d at 266. Especially considering the fact-intensive nature of the *Graham* test for excessive force, I do not believe that a reasonable officer in Garrison's position would have understood those cases to address the present situation, *see Estate of Rodgers ex rel. Rodgers v. Smith*, 188 Fed. App'x 175, 182 (4th Cir. 2006) ("*Kopf* and *Vathekan* stand at most for the principle that the Fourth Amendment is violated when an officer *who faces no immediate threat* deploys a police dog without prior warning." (emphasis in original)).

35

In sum, for all of the aforementioned reasons, I believe that a reasonable officer in Garrison's position could have concluded that he was constitutionally justified in prolonging the dog-bite seizure for a few seconds while he confirmed that the man hiding in the bushes was not holding a weapon. I therefore believe the district court properly granted summary judgment to Officer Garrison on the basis of qualified immunity.

PAMELA HARRIS, Circuit Judge, dissenting:

As my colleagues in the majority recognize, this is a most unfortunate case. Because he was homeless, Mr. Maney found himself "in the wrong place at the wrong time," Maj. Op. at 8[1]: outside a vacant house thought to shelter the suspect in an unarmed robbery. Maney was not himself suspected of any crime, armed or not, and he did not attempt to flee or to resist. Nevertheless, Officer Garrison deliberately subjected him to a canine attack in order to rule out any possibility that he might pose a threat. Whether or not a more customary *Terry* stop might have been authorized, I think it is clear enough that the circumstances did not justify the sustained mauling of Maney.

Clear enough, that is, to warrant denial of qualified immunity to Garrison on Maney's excessive force claim. As the majority cogently explains, even if Garrison violated the Fourth Amendment when he decided to allow his dog to continue attacking Maney, qualified immunity will protect him from liability unless the Fourth Amendment right in question was "clearly established" at the time of the events in question. Maj. Op. at 9-10. The "border between excessive and acceptable force" can be a "hazy" one, *Saucier v. Katz*, 533 U.S. 194, 206 (2001), and where the question is close, then it cannot be said that "any reasonable official in the defendant's shoes would have understood" that he was outside constitutional bounds, *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014), as is required before liability may be imposed.

---

[1] "Maj. Op." refers to the majority opinion, and "Conc. Op." to the concurring opinion.

There is one question in this case that might qualify as a close one, and that is whether Garrison was justified in seizing Maney at all, let alone by way of canine attack. For present purposes, I will credit Garrison's account of events, which has Bikkel, Garrison's dog, launching the attack on Maney on his own initiative and to Garrison's surprise. And on that premise, I will assume that no seizure occurred until Garrison — again, by his own testimony — observed the attack and determined that Maney was not his suspect, and then intentionally let the mauling continue until Maney could show his hands and demonstrate that he was unarmed. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 596–97 (1989) (Fourth Amendment seizure occurs when officer terminates freedom of movement through means intentionally applied); Maj. Op. at 16-17.[2] But there is no dispute that there was in fact a seizure here, and that means that the threshold question in this case, before we even get to the use of force, is why Garrison was entitled to detain Maney in the first place.

With no help from Garrison, who fails to address this question altogether, the majority posits that Maney's seizure was authorized by *Terry v. Ohio*, 392 U.S. 1 (1968), which allows for a brief investigative stop on reasonable suspicion of criminal activity.

---

[2] In fact, there remains a material dispute as to precisely when Garrison saw Maney and recognized that he was not the robbery suspect. As noted above, Garrison claims that he realized Maney was present only after the canine attack already was in progress. But a reasonable jury crediting Maney's version of events could find otherwise. Because Maney contends that the bushes in which he was crouched were "devoid of foliage and leaves," J.A. 229, and that the area was lit by two streetlights, it is reasonable to infer that Maney was visible to Garrison before the attack. Whether Garrison saw Maney before or after Bikkel's attack began bears materially on the reasonableness of Garrison's actions, making summary judgment inappropriate.

Although Garrison knew that Maney was not the unarmed robbery suspect he was tracking — and also that no accomplice to that unarmed robbery had been reported — he might reasonably have believed, according to the majority, that Maney was involved in a crime. Maj. Op. at 17-19.

I think the better view is that there was not reasonable suspicion sufficient to support a *Terry* stop in this case. As the majority recognizes, Maj. Op. at 18, "an individual's mere presence in an area of expected criminal activity . . . is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *United States v. Bumpers*, 705 F.3d 168, 171-72 (4th Cir. 2013) (internal quotation marks omitted). And that is mostly what this case is about: Maney's unfortunate presence outside the house to which Garrison had tracked his suspect. The only other factor relied on by Garrison was that Maney was not exhibiting "normal bystander behavior," J.A. 169 — that is, Maney was crouched in the bushes near an abandoned house at a little after 10:00 p.m. and did not identify himself to the police.[3] But Garrison had just passed through what he knew to be a homeless camp, approximately 150 yards away, so he was

_____

[3] At no point in his deposition did Garrison suggest that he believed that Maney and his suspect had close contact while working together, leading Bikkel to confuse Maney's scent with the suspect's. *Cf.* Maj. Op. at 18; Conc. Op. at 30. Instead, Garrison attributed Bikkel's attack on Maney solely to the fact that Maney happened to find himself in proximity to a suspect hiding under the house: "[T]he way the wind was blowing, [the suspect's] odor was conjugating up where all the bushes were, where Mr. Maney was hiding." J.A. 278. But that explanation is called into question by the fact that Garrison never bothered to look under the house for the suspect he allegedly believed to be hiding there. So a reasonable jury could conclude that what Garrison actually understood was that Bikkel simply had made a mistake, and that his suspect was nowhere on the premises.

aware that there was a perfectly innocent explanation for Maney's presence near the abandoned house. And I would not count against Maney his failure to stand and identify himself, which Maney — quite reasonably, in hindsight — attributes to his fear that a sudden movement might prompt a dog attack. Citizens are under no free-standing obligation to identify themselves to the police, *see Brown v. Texas*, 443 U.S. 47 (1979) (overturning defendant's conviction for refusing to stop and identify himself to police), and it was Garrison who failed to give the standard announcement or warning — the same one he gave while tracking through the homeless camp — that would have put Maney on notice that he should speak up and allowed him to come forward in safety.

That is the question that this case should be about: whether Maney's presence at the scene of the police action justified a brief investigative *Terry* stop based on reasonable suspicion. Had events unfolded as they should have — had Garrison seen Maney and detained him without deploying Bikkel, or ended Bikkel's attack as soon as possible but further detained Maney to ensure that he posed no threat — then we could have the customary debate about whether there was reasonable suspicion sufficient to support a *Terry* stop. In my opinion, there was not. But this is a qualified immunity case, and I will assume, *arguendo*, that whether a standard *Terry* stop was justified is not "beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), as required to defeat qualified immunity.

A standard *Terry* stop, of course, is not what happened here. Garrison did not end the attack on Maney as soon as he realized that Bikkel was biting a man who was not his suspect, and then detain Maney by ordinary means. Instead, he made the deliberate

40

decision to detain Maney by way of an ongoing canine attack, until Maney could show his hands and satisfy Garrison that he was not armed. And at that point in the proceedings — when Garrison, by his own account, intentionally prolonged a violent assault on Maney to determine whether he might pose a threat — I believe we have run out of close questions of law.

*First*, no reasonable officer could think that he was entitled to effectuate a *Terry* stop by way of canine attack. On this point, *Terry* and its progeny are perfectly clear. *Terry* carves out an exception to the general rule that seizures of the person must be justified by probable cause, allowing for brief investigative stops on the lesser standard of reasonable suspicion. 392 U.S. at 21-22. But precisely because a *Terry* stop requires only reasonable suspicion and not probable cause for an arrest, *Terry* authorizes only a carefully "limited intrusion on the personal security of the suspect," *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) (police exceeded limited intrusion allowed on reasonable suspicion when they removed suspect from public area of airport and detained him in private room for questioning) — classically, an approach on the street to question a suspect about his conduct, *see Terry*, 392 U.S. at 23. And *Terry* itself addresses the question of what an officer may do to protect his safety during such a stop: If and only if the officer has an objective and articulable reasonable suspicion that a suspect is armed and dangerous — a standard that nobody argues was met in this case — then the officer may conduct a limited pat-down of a suspect's outer clothing for a weapon, and that is all. *Id.* at 24-25.

41

The gap between what *Terry* allows on reasonable suspicion and what transpired in this case is so vast that no reasonable officer could have failed to appreciate the difference. Any suggestion that a police officer, operating only on reasonable suspicion and without probable cause, and with no objective basis for believing a suspect to be armed — no report of a crime involving a weapon, no weapon or suspicious bulge observed, not even a furtive gesture — could skip past the stop and question, past the frisk, and go directly to canine attack under the auspices of *Terry* simply cannot be credited.

It is true, as the majority explains, that officers conducting *Terry* stops may use "such reasonable force as may be necessary" to effectuate the stop. *United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987). But any such use of force must be consistent with the general *Terry* framework described above, which, again, allows only for significantly limited intrusions on personal freedom and security, in light of the fact that there is no probable cause of criminal activity. That is why, as the cases cited by the majority make clear, Maj. Op. at 19-20, the hard questions in this area are about things like *displays* of force — we have permitted officers to draw weapons during a *Terry* stop, *see United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993), but have described the practice as an "extraordinary measure[]," *United States v. Taylor*, 857 F.2d 210, 213-14 (4th Cir. 1988) — and the use of handcuffs to restrain a suspect known to be armed, *see Young v. Prince George's Cty.*, 355 F.3d 751, 755 (4th Cir. 2004). Use of a canine attack in a reasonable-suspicion stop, where a suspect is not resisting, attempting to flee, or otherwise making

extraordinary measures "necessary," is not a hard question, and it cannot be reconciled with settled understandings about the limited nature of the intrusion permitted by *Terry*.

I do not want to belabor what I think is an obvious point. But this is an issue on which we must not allow confusion or excuse error. Because they are permitted on less than probable cause, *Terry* stops are exceedingly common; in New York City alone, police conducted 4.4 million reasonable-suspicion stops between January 2004 and June 2012. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 556 (S.D.N.Y. 2013). Countless citizens who ultimately will be found to have committed no crime are subject to *Terry* stops on a daily basis. No police officer should be under the impression that whether canine attacks may be used to carry out those stops, as a first resort against suspects who are neither fleeing nor resisting, is an open or difficult question.

*Second*, even if we were to hypothesize some other justification for Maney's seizure, so that *Terry*'s restrictions do not apply, it would remain clear that the Fourth Amendment's more general limits on the use of force were exceeded here. Whatever the imagined alternative basis for Maney's seizure — and assuming, for the sake of argument, that there was one, despite the undisputed absence of probable cause — use of force in its effectuation would be subject to the "objective reasonableness" test of *Graham v. Connor*, 490 U.S. 386, 394-97 (1989). And while many *Graham* cases present close questions, this is not one of them.

On one side of the *Graham* balance, we have the degree of force used against Maney. *See* 490 U.S. at 396 (balancing "nature and quality of the intrusion on the individual's Fourth Amendment interests" against countervailing government interests);

43

*Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) (nature of intrusion on individual interests generally measured by the amount of force employed, with consideration of extent of injuries). A mauling by a police dog is not only terrifying for the subject but also likely to inflict severe injury; as we have explained, "[t]he force of a police dog's bite is between 1,200 and 2,000 pounds per square inch," *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 177 n.3 (4th Cir. 1998). In this case, Garrison's dog first bit the top of Maney's head, tearing away a two-square-inch section of hair, skin, and tissue. This wound ultimately required a fifteen-and-three-quarter-inch skin graft. Then, as Maney pleaded with the police to stop the attack, the dog bit Maney twice more, causing deep wounds on his left arm and left thigh. Those injuries led to a brachial artery blood clot and profuse bleeding, bruising, and swelling.

And on the other side of the balance, we have the weight of the government interest in prolonging the canine attack on Maney, rather than ending the attack and substituting normal means of detention. *See Graham*, 490 U.S. at 396. That interest is to be evaluated in light of the totality of the circumstances and with special attention to the so-called *Graham* "factors": "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* And as the district court held, not one of those factors can explain why it was necessary or constitutionally reasonable to employ a canine attack against Maney once Garrison realized that Maney was not his suspect. At that point, "there was no crime at issue associated with [Maney]," severe or not, that could justify this level of force. J.A. 379. Nor was there

44

any objective reason to suspect Maney of being a threat, notwithstanding Garrison's "contention that hiding from police is not normal bystander conduct," J.A. 380; again, Garrison, who was responding to a call on an *unarmed* robbery, saw nothing — not a weapon, not a bulge, not a movement — to indicate that Maney was armed. And finally, Maney was not fleeing from the police when force was deployed, or otherwise resisting efforts to detain him. *Id.* Perhaps Garrison reasonably could have believed that Maney's presence on the scene and failure to identify himself justified a brief investigative stop. But under *Graham*, there is simply nothing — not one factor — that could have led a reasonable officer to think that he could use the level of force associated with a canine attack to carry out that investigation.[4]

*Third*, the sudden and fast-moving nature of Garrison's encounter with Maney does not compel a different result. It is true, as *Graham* instructs and the majority explains, that "[b]ecause 'police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." *Waterman v. Batton*, 393 F.3d 471, 476-77 (4th Cir. 2004) (citation omitted) (quoting *Graham*, 490 U.S. at 397); see Maj. Op. at 21, 24. But the

---

[4] The concurring opinion applies the *Graham* factors not to Maney but to the unarmed robbery suspect Garrison was tracking, and concludes that a reasonable officer could have believed himself authorized to subject that suspect to a canine attack. Conc. Op. at 29-30. I have my doubts. But regardless, that is not the question in this case. What matters here is whether Garrison acted reasonably under *Graham* when he decided to extend a violent attack against a person he recognized was *not* the suspect for whom he was searching.

problem here is not facts discovered after the events in question, with the luxury of hindsight; it is that on the facts as perceived by Garrison himself, at the scene and in the heat of the moment, no reasonable officer could have thought that the Fourth Amendment allowed him to extend Bikkel's violent attack on Maney.

This not a case, that is, in which things moved so quickly that Garrison was powerless to discern or respond to changing circumstances. On the contrary: Garrison testified that notwithstanding the commotion surrounding Bikkel's initial attack on Maney, he came to a deliberate decision to permit the canine — undisputedly on a lead and within his control — to continue mauling Maney until Maney showed his hands. The tense conditions of the encounter did not prevent Garrison from ascertaining, correctly, that the man being mauled — white and not bald — was not his bald, African-American suspect. And they did not cause Garrison to misperceive the existence of a weapon, or even a gesture that might have been a reach for a weapon. *Cf. Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) (because facts are viewed "from the perspective of the officer" under *Graham*, use of deadly force justified where officer reasonably but incorrectly perceived subject to be armed and reaching for a gun); *Waterman*, 393 F.3d at 477–80 (given split-second nature of decision, use of deadly force justified where officers reasonably perceived vehicle lurching forward as assault on them).

What Garrison got wrong was not the facts, but the law: It is not the case, as Garrison appears to have believed, that — in the absence of probable cause, an attempt to flee or resist, or even a mistaken perception of a weapon or threatening gesture — Maney could be subjected to a canine attack for failure to exhibit "normal bystander behavior" at

46

the scene of a police investigation into an unarmed robbery. J.A. 169. And that kind of legal misjudgment, we have made clear, will not render the use of force reasonable, no matter how pressing the circumstances. Even in the most rapidly evolving and fraught encounters, lasting no more than moments and involving perceived threats far graver than the one Garrison believed himself to be facing, police officers are charged with applying Fourth Amendment use-of-force restrictions on a second-by-second basis, and responding immediately to changed circumstances or new information. *See Waterman*, 393 F.3d at 481 ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated"); *Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011) (deadly force justified at start of encounter no longer justified seconds later). Bikkel's attack on Maney may have been brief[5] and tumultuous, and — crediting Garrison's account — it may have begun as an unintentional restraint and thus a non-seizure for Fourth Amendment purposes. But "pars[ing] the sequence of events as they occur[red]," *Brockington*, 637 F.3d at 507, what matters is the precise moment in which Garrison consciously decided to allow Bikkel to continue mauling a

---

[5] It is worth noting that under the majority's rule, as I understand it, the brevity of Bikkel's attack on Maney may be a virtue, but it is not a necessity. For the majority, what makes this case a close enough question to trigger qualified immunity is not that Garrison ended the attack on Maney seconds after deciding to allow it; it is that Garrison ended the attack as soon as he had satisfied himself that Maney did not pose a threat. Maj. Op. at 21; *see* Conc. Op. at 32. Had it taken longer for Garrison to assure himself that Maney meant him no harm — had, for instance, Bikkel's attack prevented Maney from showing his hands quickly, as a police canine attack often will do, *see Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991) (reasonable jury could find it objectively unreasonable to require person to show his hands and surrender while being attacked by police dog) — then the duration of the attack could have been extended accordingly.

non-suspect in his unarmed robbery case. And at that moment, on the facts as he perceived them, Garrison made an objectively unreasonable legal judgment.

*Finally*, as I have said already, I do not believe that this case falls within a "gray area," *see id.* at 508, entitling Garrison to qualified immunity because the Fourth Amendment limits he exceeded were not sufficiently "clearly established" to put him on notice. Our qualified immunity analysis takes into account "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Amaechi v. West*, 237 F.3d 356, 362–63 (4th Cir. 2001); *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (officials can "be on notice that their conduct violates established law even in novel factual circumstances"). And for the reasons given above, my view is that the "core constitutional principle[s]" and doctrine articulated in *Terry* and *Graham* make manifest that canine attacks may not be used in the first instance to seize suspects on, at best, reasonable suspicion, and without objective indicia of a weapon.

But if more were required, then I believe it is provided by our cases dealing directly with police canine attacks. Those cases clearly establish that *Graham*'s objective reasonableness standard applies to police canine attacks, *see Vathekan*, 154 F.3d at 178; that even the weighty government interest in apprehending *armed and fleeing* robbery suspects may not be enough to justify a canine attack under *Graham*, *see Kopf v. Wing*, 942 F.2d 265, 266, 268-69 (4th Cir. 1991); and that dog attacks are no exception to the rule that even in a fast-moving and tense situation, a use of force that is excusable at one moment may become unreasonable at the next, and that officers are obliged to respond

48

accordingly, *see id.* at 268 (perception that suspect was armed might justify initial dog attack, but not continuation once officers fail to see weapon). And even if that were not sufficient, there still would be our determination in *Vathekan* that a police officer may not use a canine attack as a first resort against a person found on the scene of a suspected burglary — after a resident has assured the police that no innocent person should be on the premises — in order to rule out the possibility that he or she is a burglar or otherwise poses a threat. 154 F.3d at 176-79. Unless we are going to require that the precise conduct at issue already have been held unlawful in order to defeat qualified immunity — which we do not, *see id.* at 179 — then surely this is close enough.[6]

And then, finally, there is common sense. *See Brockington*, 637 F.3d at 508. Garrison was tracking an unarmed-robbery suspect with no reported accomplice at around 10:00 p.m., while accompanied by a second police officer and a police canine. While I do not doubt that finding Maney crouched outside a vacant house may have been startling and even frightening — notwithstanding Garrison's awareness of the homeless camp in the immediate vicinity — common sense would dictate that use of a violent

---

[6] In *Vathekan*, the particular conduct at issue was a police officer's failure to "enable innocent persons to exit the area" by giving a verbal warning before unleashing his dog. *See* 154 F.3d at 176. And in its assessment of *Vathekan*, the majority focuses on the distinction between on- and off-leash status and the requirement of an off-leash warning. Maj. Op. at 10-12; Conc. Op. at 34-35. But the point is that an off-leash warning is required in order to avoid the *unintentional* mauling of "innocent persons," 154 F.3d at 176 — even those who appear to have no legitimate reason for being on the scene of a suspected crime. No reasonable officer could fail to understand that the same principle, *a fortiori*, would prohibit Garrison's *intentional* decision to allow the continued mauling of Maney.

canine attack to address those fears was an overreaction. And if there is a paucity of case law addressing the intentional use of a police canine attack against a non-fleeing, non-resisting, non-suspect in a non-armed robbery, common sense tells us that this is because the principles of *Terry* and *Graham* are sufficiently clear that no reasonable police officer could so badly misjudge their application.

In the end, what is missing from this case is any sense of proportionality, the touchstone of *Graham*'s objective reasonableness standard. *See Vathekan*, 154 F.3d at 179. Garrison imposed an enormous cost on Maney when he allowed Bikkel to continue his savage attack. He did so intentionally, knowing that Maney was not the suspect he was tracking, without any indication that Maney was armed, and absent any resistance by Maney, in order to address an inchoate concern that Maney nevertheless might pose some threat. Because I believe that the Fourth Amendment unmistakably renders that response disproportionate and excessive, I must respectfully dissent.